901 So.2d 27 (2004)
The BIRMINGHAM NEWS COMPANY
v.
Sherry HORN.
The Birmingham News Company
v.
Hugh Stewart.
The Birmingham News Company
v.
Kameron Hyde.
The Birmingham News Company
v.
Jesse Glass.
The Birmingham News Company
v.
James McLendon.
The Birmingham News Company
v.
Teresa McLendon.
1020552, 1020553, 1020554, 1020555,1020556, and 1020557.
Supreme Court of Alabama.
June 11, 2004.
Opinion Overruling Application for Rehearing November 24, 2004.
*30 Gilbert E. Johnston, Jr., James P. Pewitt, and Meredith McCollum Aldridge of Johnston Barton Proctor & Powell, LLP, Birmingham, for appellant.
Ted Taylor, Leah O. Taylor, and Rhonda Pitts Chambers of Taylor & Taylor, Birmingham, for appellees.
HARWOOD, Justice.
This opinion addresses the appeals by The Birmingham News Company ("the News") of approximately $20 million in awards made by arbitrators to Sherry Horn, Hugh Stewart, Kameron Hyde, Jesse Glass, James McLendon, and Teresa McLendon ("the plaintiffs"). The plaintiffs are individuals who at one time had "dealer agreements" (hereinafter the "agreement") with the News to sell and distribute its newspapers to the public. The arbitration awards were based upon the plaintiffs' claims that the News wrongfully and illegally terminated those agreements. Five of the plaintiffs (Horn, Stewart, Hyde, Glass, and James McLendon), represented by the same law firm, initially brought their claims in the Jefferson Circuit Court. The News moved to compel arbitration of the claims as provided for in the arbitration provisions in the agreements. Each agreement, including the arbitration provision, is substantially the same. The trial court ordered the claims to arbitration, and three of the plaintiffs (Stewart, Hyde, and Horn) sought review of the trial court's order in this Court. This Court denied relief because the agreements affected interstate commerce sufficiently to invoke the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), to preempt state law barring the enforcement of predispute arbitration agreements. Ex parte Stewart, 786 So.2d 464 (Ala.2000); Birmingham News v. Horn, 790 So.2d 939 (Ala.2000). Teresa McLendon did not have a pending case, but she participated in arbitration along with the rest of the plaintiffs.
An arbitration panel composed of three arbitrators was selected in the manner prescribed in each agreement. The News selected J. Mark White as an arbitrator; the plaintiffs selected Donald Watkins; and Milton C. Davis was appointed by the chief judge of the United States Federal District Court for the Northern District of Alabama. The News does not challenge the manner of selection of the arbitrators or the arbitrators' qualifications or their fitness. In addition to providing for the *31 selection of the arbitrators, each agreement contained in paragraph 10 the following language concerning arbitration:
"Except as herein provided, and as provided in any other provision of this Agreement, all claims and controversies arising out of this contract shall be submitted to arbitration for determination. It is agreed, however, that if either party shall terminate this contract by reason of the alleged breach thereof by the other party, the sole issues for determination shall be whether or not the termination was valid, whether or not either party shall be entitled to money damages, and, if so, the amount thereof, which issues only shall be submitted to arbitration. It is expressly agreed that in case of such termination neither party shall be entitled to have this Agreement reinstated nor to be restored to his or its status thereunder, notwithstanding the fact that it may be determined that the termination by the other party was not warranted. In any event, [the plaintiff] shall not claim any additional compensation for good will, but acknowledges that his entire compensation under this agreement is the difference between the wholesale and resale price of newspapers purchased and sold by him.... The award shall be effective and binding upon the parties if executed by two of the arbitrators. Judgement upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof."
After the parties completed extensive discovery, the arbitration panel heard the claims on September 25 through 27, and October 9, 2002. The panel heard testimony from many witnesses, accepted numerous depositions, and received into evidence more than 400 exhibits. The panel issued its 49-page decision on December 30, 2002, signed by Watkins and Davis; White wrote separately, concurring in part and dissenting in part from the award. The monetary awards to the individual plaintiffs, consisting of both compensatory and punitive damages, were in the amounts hereinafter explained. On January 8, 2003, the News filed notices of appeal in the cases with the circuit clerk of Jefferson County and also filed "Motion[s] to Vacate and Set Aside Arbitration Award." On January 13, 2003, the circuit clerk entered the arbitrators' awards as the judgments of the court. The trial court did nothing further, so that on January 23, 2003, pursuant to Ala.Code 1975, § 6-6-15,[1] the judgments became final. The News did not file any subsequent notice of appeal.

I. Findings and Conclusions of the Arbitration Panel
The decision of the arbitration panel contains detailed findings of fact and explicit legal conclusions underlying the awards. The panel determined that in 1959 the News instituted a "franchise" system pursuant to which its newspapers were sold to the public through a network of over 200 independent contractors, most of whom were known as "dealers." Each dealer purchased from the News a distribution "branch," i.e., a specified territory in which the dealer would have the exclusive right to distribute the newspapers. The dealers bought the newspapers from the News at a certain price and sold them to home subscribers or through vending machines or other retail outlets for a higher price, retaining the difference, which reimbursed them for their expenses and provided a profit.
The panel's decision discusses at some length the testimony and documentary evidence *32 supporting its determination that the dealerships were franchises,[2] including a determination by the United States Internal Revenue Service that for tax purposes one of the dealerships was a franchise and evidence showing that the News educated its dealers on their respective duties as franchisees. The panel cited testimony showing that management employees of the News had often referred to the dealerships as franchises. The panel further determined that after the initial dealership franchises were created and sold by the News, the only way a person could become an independent dealer was to purchase an existing franchise from another dealer. The panel found that during the 40-year period from 1959 to 1999, dealership franchises were often sold by one dealer to a successor dealer with the knowledge and approval of the News, and the franchises were "a very marketable commodity." Moreover, the panel found that the frequency with which the franchises were sold had resulted in a standardized means of valuing a dealership franchise, using an amount representing three times the expected yearly income from that dealership franchise. The panel determined that the plaintiffs had purchased their dealership franchises from other dealers, at purchase prices ranging from $80,000 to $250,0000 per dealership franchise.
With the exception of the specifics of the dealership territory, the agreements were standardized; the versions signed by the plaintiffs varied only slightly from the 1959 version. The agreement permitted the dealer to assign or transfer the rights granted by the agreement, subject to a right of first refusal by the News. Beginning in the 1970s, the agreements included a provision requiring that disputes between the News and a dealer be resolved by arbitration. Also, from 1959 until July or August 1999, each agreement contained in paragraph 8 an "automatic renewal" provision; that provision stated, in pertinent part:
"8. Term

"This agreement shall exist and be in force until the ____ day of ______, 19 ____, and thereafter shall be automatically renewed from year to year unless terminated by either party by giving the other party written notice of termination on or before thirty (30) days prior to the annual renewal date. In the event of the failure of either party to perform any of its obligations under this Agreement, the other party may terminate this Agreement upon prior written notice, subject, however to the provision of Paragraph 10 (the Arbitration Provision) herein. Notice shall be given hereunder by depositing the same in the United States Mail, postage prepaid, and addressed to the other party at his business address herein above set out."
(Emphasis original.) Generally, the blank date in this provision (hereinafter sometimes referred to as "paragraph 8") would be completed by inserting the date of the first anniversary of the execution of the agreement. Annual renewals would thereafter occur with reference to that date.
*33 The agreements required the dealers to maintain a reasonable level of circulation for their territories and to be responsible for the timely delivery of the newspapers. Dealers were responsible for delivering the newspapers to subscribers by specified times, and the News and the dealers maintained separate records concerning the number of newspapers dealers purchased from the News and subsequently sold and delivered to subscribers. In most cases the dealers were directly responsible for transactions with subscribers, including obtaining new subscriptions, maintaining old subscriptions, and collecting subscription payments. Dealers were compensated monthly based upon a calculation by the News of the difference between the dealers' wholesale purchases and the retail sales. Dealers also received some additional compensation, not specified in the agreement, for advertising "inserts" placed in the newspapers, for special promotions, and for route allowances.[3]
Although the agreements were renewed annually, for the most part those renewals were automatic, and new agreements were executed only when a new provision, such as the arbitration provision, was added to the agreement. The panel found that between 1959 and 1999 long-time dealers had executed very few renewal agreements subsequent to their initial agreements. When it wanted to add a new provision to an agreement, it was the practice of the News to inform the dealer of the change and to give the dealer the choice between accepting the change or having the dealership terminated. The panel also noted that a manager with the News, Jim Craig, who had handled hundreds of agreements, including those of the plaintiffs, testified that he regularly represented to dealers that the dealer's franchise would be renewed automatically so long as the dealer performed satisfactorily. The panel also determined that the News evaluated a dealer's performance based upon an assessment of the dealer's performance in three areas: sales, i.e., maintaining circulation levels; service, i.e., delivering the customers' newspapers in a timely fashion; and collections, i.e., paying the News fully for the newspapers sold by the dealer.
The panel determined that the News's business relationships with the dealers had been consistent with its representations to them until its management changed and new policies were implemented. Toby Pearson began work as the News's circulation director in December 1996, and he hired Jim Keeble as assistant circulation director in November 1997. The two managers were primarily responsible for the News's business relationships with the dealers. The panel found that Pearson and Keeble began to implement changes in the distributorship system with an aim of immediately increasing the News's profits. In that regard, the panel found, Pearson and Keeble, by maintaining that the dealers had no property interest in their franchises, took a position contrary to the position the News had always taken. In the panel's view, Pearson and Keeble began to attempt to coerce dealers into changing routes and delivery procedures to increase the News's profits, without regard to the additional costs imposed on the dealers by those changes. The panel found that Keeble in particular had an authoritarian management style, exemplified by testimony that he had instructed the dealers' immediate supervisors to "treat everyone like sons of bitches." The panel concluded that there was convincing evidence indicating *34 that Pearson and Keeble's ultimate objective was to eliminate the dealers so that the News could obtain directly the profits the dealers were realizing. The panel also found that the News had made representations to the plaintiffs concerning the automatic renewal of the plaintiffs' dealership franchises that it did not intend to meet at the time it made the statement and that Pearson's and Keeble's testimony to the contrary was not credible.
The panel noted that soon after Pearson began working as circulation director, the News began acquiring dealers' branches and had acquired four branches by 1999, which were in addition to those ultimately acquired by terminating the plaintiffs' dealership franchises. Two of those four branches were purchased by payment by the News of significant consideration to the dealer.
Among the steps implemented by the News that negatively impacted the dealers was the decision to require the dealers to choose between "single copy" and "home delivery" distribution[4] for their areas. This policy effectively forced most dealers to relinquish a significant portion of their business. In most cases, a dealer would retain either the "single copy" portion or the "home delivery" portion and sell or trade the other portion of his or her business to another dealer. Although the panel found that the policy of splitting the two delivery categories had a profound effect upon a dealer's business, the News did not compensate the dealers for the losses caused by this new policy. The News also implemented changes in its delivery systems and changed its policy from awarding incentive bonuses for good performance to imposing financial penalties for alleged poor performance.
The News began to evaluate dealer performance by applying the measure of "complaints per thousand" ("CPT"). CPTs were calculated by a ratio of complaints received by the News per 1,000 deliveries. Complaint information was obtained from an automated program that tallied information the News received from subscribers that it regarded as complaints about delivery, such as when subscribers complained about deliveries not being timely or not stopping or starting according to the subscriber's request.
The panel determined that the CPT system of evaluating dealer performance was flawed in a number of ways, including the generation of duplicate complaints, and "was unreliable at best." The panel found that despite the News's knowledge that the accuracy of CPTs was questionable and despite the fact that CPTs were originally intended to be used as a means of calculating incentive bonuses, in December 1997 the News began using CPTs as a basis for imposing financial penalties on dealers and for threatening dealers with the nonrenewal of their dealership franchises. The News accomplished those objectives through a series of three letters to the dealers. The first letter informed the dealer that his or her CPT performance was at a "totally unsatisfactory" level; the letter did not state what CPT would be satisfactory. In the event the CPT did not improve substantially, a second letter was sent the following month, stating that unless the CPTs were reduced, the News would "exercise [its] right to terminate your Agreement for nonperformance of your obligations, or [the News] may decide not to renew it at its expiration." The letter did not provide the dealer with any specific goal that would represent satisfactory *35 performance. The third letter was a notice that the agreement was being terminated or that it would not be renewed. Stewart and Hyde each received this third letter.
In accord with their belief that dealers had no property interest in their dealership franchises, Pearson and Keeble drafted a change to paragraph 8 of the agreement. The new provision stated:
"This Agreement shall be from ______, and shall expire on ______, unless renewed by mutual agreement of the parties. Provided, however, the Agreement may be immediately terminated by either party in the event of the failure of either party to perform any of its obligations under this Agreement, subject to the provisions of Paragraph 10 herein."
This change was implemented in July or August 1999. Keeble acknowledged in his testimony that he implemented the change without considering the dealers' earlier agreements or the dealers' expectations, and that no alternatives to the provision were considered. The agreements were presented to the dealers on a "take-it-or-leave-it" basis; the dealer's choice was either to sign the agreement or to lose the dealership. Plaintiffs Horn, Glass, James McLendon, and Teresa McLendon refused to execute the new agreements; their dealerships were terminated on the anniversary dates of their agreements without compensation, and their branches were taken over by the News.
The panel declared that it had carefully observed the demeanor of each plaintiff along with his or her testimony and that based on those observations and that respective testimony, it concluded that each plaintiff had suffered significant mental anguish; "The News's appropriation of their livelihoods has had a profound effect on each of them, not only financially but emotionally." The panel also stated:
"The panel finds and holds that the record supports by clear and convincing evidence that the News consciously, deliberately, systematically, intentionally and without just cause or excuse set about to dismantle, destroy and nullify the franchise-dealership territories, contracts and agreements which had existed between the parties and that the actions and conduct of the News were deliberately calculated to permanently eliminate the dealerships and take the property owned by the dealers without just compensation."
The panel heard evidence from James L. "Butch" Williams, a certified public accountant, certified valuation analyst, and certified business appraiser, concerning the valuation of the plaintiffs' dealership franchises. The panel determined that Williams was highly qualified and credible and that, with the exception of some small adjustments, his business valuation testimony was unrebutted by the News. Williams testified that the change in the renewal provision greatly reduced the value of the franchises. The panel noted that although the News's expert, William Kummel, testified that the change was "cosmetic" and that it had no effect on the value of the dealership franchises, he had prepared a chart showing that the average sales price of a franchise had declined from approximately $348,000 in 1995 to $40,000 in 1999. The panel stated that Kummel's valuation opinions were "of little or no value," because, it concluded, he lacked the necessary qualifications and experience.
Generally, the panel found:
"The change in the term provision of the dealer agreement, coupled with Toby Pearson and Jim Keeble's management style, had the effect of abruptly destroying the market value for plaintiffs' dealerships. In essence, The News changed its delivery system without *36 compensating the dealers for the loss of their businesses. The unfairness of this change is further exacerbated by the fact that the changes in the delivery system, as embodied in the contract changes was never the subject of bargaining or negotiations."
Concerning each individual plaintiff, the arbitration panel made extensive particularized findings. We paraphrase those findings in narrative form, to the extent pertinent to our later dispositions:

A. Jesse Glass
Glass began delivering papers for the News in 1975 and purchased his branch in 1987 for $135,000. The automatic renewal of the agreement was a factor in Glass's decision to purchase a branch as an ongoing business. He received assurances from the News that he was purchasing a contract that would be his for as long as he wanted it and that the News would not implement changes that would adversely affect the value of his dealership franchise. Glass had a good working relationship with the News until Pearson and Keeble were hired. After the arrival of Pearson and Keeble at the News, he was forced to split his deliveries and to trade the single-copy portion of his franchise to another dealer for an additional home-delivery area at a cost to Glass of approximately $35,000. The News debited nearly $7,000 from his account without substantiation and later tried to force him into a $500 monthly route reduction. Shortly before his agreement was terminated, Glass was presented with the revised version of the agreement that eliminated the automatic-renewal provision. He had very little time to make a decision on whether to renew the agreement and was extremely worried about how the elimination of the automatic-renewal provision would affect his business. When he declined to sign the renewal agreement, the News terminated his dealership franchise on its anniversary date. He testified that at the time it was terminated his dealership franchise was worth $423,286. Williams valued the loss of Glass's dealership at $285,000, and he valued Glass's lost profits, reduced to a present value, at approximately $848,603 for a 20-year period.

B. James McLendon and Teresa McLendon
Plaintiff James McLendon ("Jay") began delivering papers for the News in 1973; in 1987, he purchased a dealership branch for $75,000 and sold it four years later for $110,000. In 1995 he purchased the dealership branch his father owned, for three times its gross annual earnings, a total $275,000, to be financed over 20 years. Jay experienced few difficulties and no reprimands in connection with the operation of his branch until Pearson and Keeble were hired by the News. After that, he began receiving "reprimand" letters. When he was forced to split his deliveries, he transferred his home deliveries to his wife, Teresa, who had more than 20 years experience as a delivery person for the News. Jay and Teresa thereafter both executed agreements containing the automatic-renewal provision, and both testified that they were assured that they would retain their dealership franchises as long as they performed their jobs satisfactorily.
In December 1999, Jay was presented with the agreement that eliminated the automatic renewal; the News rejected his offer to sell his branch to the News. When he subsequently refused to sign the revised agreement, his dealership was not renewed on its anniversary date in January 2000 and it was taken over by the News. The News mistakenly allowed Teresa's agreement to renew for an additional year but presented her with the revised agreement in January 2001; when she refused to sign it, the News took over her *37 portion of the branch upon the expiration of her agreement. The McLendons testified that the value of their franchise was $309,600. Williams valued it at $285,000, and he calculated the McLendons' lost profits, reduced to present value, to be $975,955 over a 20-year period.

C. Sherry Horn
Horn purchased her branch in 1993 for $140,000, after the News assured her that her agreement would be "automatically renewable." When the News forced dealers to split their home-delivery and single-copy service, the portion of Horn's dealership that was single-copy service was the smallest of any branch. The News refused her request that it purchase her single-copy service. When Horn was presented with the revised agreement eliminating the automatic-renewal feature, she refused to sign the agreement, and her agreement was "nonrenewed" on its January 31, 1999, anniversary date. Williams valued her franchise at $200,000; he calculated her lost profits, reduced to present value, for a 20-year period at $610,340.

D. Hugh Stewart
Stewart purchased his branch along with his father in 1988 for $125,000. He testified that the News assured him that an advantage of having a "franchise" was that he would have the branch "for life." He purchased his father's interest in 1993 for $75,000; that same year he executed an agreement with the News that contained an automatic-renewal provision. In March 1997, Stewart complained to the News about its imposition of fines and its refusal to provide credits. In August 1997, he received a letter from Pearson stating that his performance was unsatisfactory and that his dealership franchise would not be renewed. Stewart began keeping meticulous records of his service. The News offered Stewart a 90-day extension on his agreement in September 1997 and thereafter allowed him to execute another agreement, on January 1, 1998, containing the automatic-renewal provision.
Stewart presented the News with his records and reports of investigations of complaints, showing that the News's CPT information was inaccurate; he never received a response. Stewart was never provided any specific information by the News as to what constituted satisfactory performance. He received a letter in April 1998 stating that his CPT of 4.0 was totally unsatisfactory; he presented evidence at the hearing before the arbitration panel indicating that, according to his records, that CPT was inaccurate. In May 1998 he received another letter from the News stating that his CPT was still at an unacceptable level. In fact, his CPT had declined during the previous month to 2.5. The News notified Stewart by letter on June 29, 1998, that it had decided to terminate his agreement but that, although it could do so immediately because of his "poor service," it would allow him 60 days to find a purchaser for his dealership. Ultimately, the News terminated his agreement effective September 1, 1998.
The documentation produced by the News concerning Stewart's CPTs contained duplications and thousands of complaints that were made after Stewart's dealership franchise had been terminated. The News's proffered reason for the terminationpoor servicewas not credible. After the News took over Stewart's dealership franchise, the CPT increased to 50.8 and, despite the fact that the dealership had been reduced in size, Keeble admitted that the News could not run the branch as well as Stewart had. Stewart valued his franchise at $340,966; its loss caused him financial difficulty and significant mental anguish. Williams valued Stewart's branch at $175,000 and assessed Stewart's *38 lost profits for a 20-year period, reduced to present value, at $533,580.

E. Kameron Hyde
Hyde purchased his franchise from the News in May 1994 for $147,000. The branch consisted primarily of apartments and contained more apartments than any other branch. Hyde's supervisor at the News from 1995 to 1997, Jack Burnham, testified that Hyde's performance was satisfactory and that he knew of no reason why his agreement would be terminated for cause. Hyde never received any information concerning what the News expected by way of job performance during that same period. In April 1998, however, Hyde received a letter from Keeble stating that Hyde's CPT was 5.7, which Keeble said was unsatisfactory, and that such unsatisfactory performance could lead to the termination of his dealership franchise. Hyde received another letter, dated June 29, 1998, stating that, "in light of [his] nonperformance," his dealership could be terminated immediately, but he would be allowed 60 days to find a purchaser for his dealership. "In any event, your Agreement will not be renewed when it expires on October 31, 1998." Hyde contacted Burnham, who also told him that the News would not renew his dealership and that he should locate a purchaser. Hyde found a prospective buyer, but when the buyer contacted the News, she was advised not to pay more for the franchise than she could make in one year because that would be all the dealership would be worth. "Hyde's contract was nonrenewed `for cause' on October 31, 1998. Jim Keeble testified that Kameron Hyde's service record was poor, and that he was terminated `for cause.' Keeble based his decision to nonrenew Hyde's contract solely on his CPT numbers." (Panel decision, p. 194.) Keeble testified that Hyde's problem was "poor customer service." The panel found that Keeble's professed reason for terminating Hyde's dealership "to be lacking in credibility" and it concluded that Hyde's "dealer relationship was wrongfully terminated."
Hyde valued his franchise at $132,363. Williams valued it at $160,000 and calculated Hyde's lost profits for a 20-year period, reduced to present value, to be $496,912.

F. Legal Findings and Damages Awards
The panel concluded that the plaintiffs' dealerships were franchises, that the News had wrongfully and intentionally terminated and converted each of them, and that the News had breached fiduciary duties it owed to the plaintiffs as franchisees. The panel found further that the agreements were ambiguous concerning automatic renewal; by resorting to the News's past practices the panel determined that the agreements were to be automatically renewed unless terminated by either party for good cause. The panel found that the News had terminated the plaintiffs' agreements without good cause, primarily as a result of the wrongful management practices on the part of Pearson and Keeble. The panel also held that the News's conduct toward the plaintiffs was so dramatically inconsistent with its practices during the preceding 40 years that the News should be equitably estopped from implementing and invoking the termination provisions it sought to apply to the plaintiffs, referencing two cases: Miskimen v. Kansas City Star Co., 684 S.W.2d 394 (Mo.Ct. App.1984), and Straup v. Times Herald, 283 Pa.Super. 58, 423 A.2d 713 (1980).
Additionally, the panel concluded that the News had defrauded the plaintiffs by intentionally and falsely representing to them that their dealership franchises would be renewed so long as they performed their work satisfactorily. The panel held that the News's actions were *39 wrongful and intentional; that the plaintiffs were entitled to recover damages for the loss of their investments, for the loss of their income streams, and for their mental anguish; and that there was clear and convincing evidence that the News's actions had been oppressive and malicious, warranting an award of punitive damages. The provisions in paragraph 10 of the agreements purporting to limit the scope of "compensation" that could be recovered were held by the panel to be invalid as contrary to public policy, on the basis of five cases cited by the panel.[5] The panel determined that an appropriate punitive-damages award for each plaintiff was an amount 2.5 times the amount of compensatory damages due that plaintiff.
In discussing its award of compensatory damages, the panel stated:
"In arriving at the amounts for each plaintiff's loss of franchise value and loss of future profits, the Panel relied upon the testimony of business valuation expert, James Williams, and the exhibits prepared by him. While everyone generally agreed that a voluntary sale of these dealerships in an open market produced a purchase price of 3 times gross earnings, the Panel adopted the more conservative multiple of 2.5 times gross revenues (excluding route allowances) in establishing franchise value."
The panel noted an exception to that approach in Hyde's case, where it applied a multiple of two times gross annual revenues in establishing franchise value.[6] The panel was of the opinion that each plaintiff had had a viable business that was reasonably expected to produce income and profits for a period of at least 20 years, with the exception of Horn, who, because of her age (she was 55 years old when her agreement was terminated), had a business interest that would be expected to continue for only 10 years. The panel held:
"The loss of future profits is a separate and distinct element of compensatory damages, particularly in light of the fact that the Panel is without the power to order these dealerships returned to the plaintiffs."
Having found in favor of each plaintiff on his or her claims of breach of contract, breach of fiduciary duty, conversion, and fraud, and deeming the damages due under each of those claims to be the same, the panel made one award for each plaintiff for all of those claims. In that regard, the panel stated:
"The Panel acknowledges that the multiple claims of plaintiffs may have duplicative damages. The Panel certifies that in its consolidation of an award of damages that it has not allowed any duplicative recovery."
The panel awarded Glass $285,000 "for loss of franchise value"; $848,603, representing the present value of the "loss of future profits for 20 years"; $200,000 for mental anguish; and $3,334,007.50 in punitive damages, for a total award of $4,667,610.50. The panel; awarded the McLendons $285,000 for "loss of franchise value"; $975,955, representing the present value of the loss of future profits for 20 years; $200,000 each for mental anguish; and $4,152,387 in punitive damages, for a *40 total award of $5,813,342. The panel awarded Horn $200,000 for "loss of franchise value"; $305,170, representing the present value of the loss of future profits for 10 years; $300,000 for mental anguish; and $2,012,925 in punitive damages, for a total award of $2,818,095. The panel awarded Stewart $175,000 for "loss of franchise value"; $533,580, representing the present value of the loss of his future profits for 20 years; $200,000 for mental anguish; and $2,271,450 in punitive damages, for a total award of $3,180,030. The panel awarded Hyde $160,000 for "loss of franchise value"; $496,912, representing the present value of the loss of his future profits for 20 years; $200,000 for mental anguish; and $2,142,280 in punitive damages, for a total award of $2,999,192.
Arbitrator White concurred in the panel's factual findings, including those findings that the News had engaged in oppressive and intentionally wrongful conduct, and agreed that the News should be held liable on the plaintiffs' claims of breach of contract and conversion. He dissented as to the finding of liability on the fraud claims, on the ground that the plaintiffs had not presented sufficient evidence that the News had had a present intent to deceive them when it represented that the dealer agreements would be automatically renewed absent deficient performance on their parts. White agreed with the panel's determination that an award of compensatory damages, including those for mental anguish, and an award of punitive damages were warranted. However, he would have made the following awards: $90,000 for loss of franchise and $180,000 in punitive damages and mental anguish to Glass, for a total award of $270,000; $285,000 for loss of franchise and $570,000 in punitive damages and mental anguish to the McLendons, for a total award of $855,000; $200,000 for loss of franchise and $400,000 in punitive damages and mental anguish to Horn, for a total award of $600,000; $170,000 for loss of franchise and $350,000 in punitive damages and mental anguish to Stewart, for a total award of $520,000; and $160,000 for loss of franchise and $320,000 in punitive damages and mental anguish to Hyde, for a total award of $480,000.

II. The Plaintiffs' Motion to Dismiss the Appeals
The plaintiffs argue that this Court does not have jurisdiction to address these appeals because, they say, the appeals were not timely filed. See, e.g., Schiffman v. City of Irondale, 669 So.2d 136 (Ala.1995); Greystone Close v. Fidelity & Guar. Ins. Co., 664 So.2d 900 (Ala.1995)(both holding that failure to timely file a notice of appeal deprives this Court of jurisdiction over the appeal). The plaintiffs contend that the appeals are not timely under Rule 4, Ala. R.App. P., which provides generally that a notice of appeal must be filed within 42 days "of the date of the entry of the judgment or order appealed from," and Ala.Code 1975, § 6-6-15, which provides:
"Either party may appeal from an [arbitration] award under this division. Notice of the appeal to the appropriate appellate court shall be filed within 10 days after receipt of notice of the award and shall be filed with the clerk or register of the circuit court where the action is pending or, if no action is pending, then in the office of the clerk or register of the circuit court of the county where the award is made. The notice of appeal, together with a copy of the award, signed by the arbitrators or a majority of them, shall be delivered with the file of papers or with the submission, as the case may be, to the court to which the award is returnable; and the clerk or register shall enter the award as the judgement [sic] of the court. Thereafter, unless within 10 days the court shall set aside the award for one or more of *41 the causes specified in Section 6-6-14, the judgment shall become final and an appeal shall lie as in other cases. In the event the award shall be set aside, such action shall be a final judgement [sic] from which an appeal shall lie as in other cases."
The plaintiffs assert that although the News complied with § 6-6-15 by initially filing notices of appeal on January 8, 2003, there was no final judgment in the cases until January 23, 2003, 10 days after the clerk of the circuit court had entered the awards as the judgments of the circuit court. Our law is settled that, with the exception of certain situations specified in Rule 4(a), Ala. R.App. P., and Rules 5 and 54(b), Ala.R.Civ.P., but not present in these cases, an appeal will lie only from a final judgment. BE & K, Inc. v. Baker, 875 So.2d 1185 (Ala.2003); Gilbert v. Nicholson, 845 So.2d 785 (Ala.2002). Thus, the plaintiffs contend that the notices of appeal filed by the News were not from a final judgment, and because the News filed no subsequent notices of appeal after the judgment was entered and became final, the 42-day period for filing an appeal under Rule 4, Ala. R.App. P., lapsed without the filing of a notice of appeal, and these appeals are untimely.
The plaintiffs support their argument by referring to the special writing by Judge Murdock in Sanderson Group, Inc. v. Smith, 809 So.2d 823 (Ala.Civ.App.2001). In that case, the Court of Civil Appeals considered the timeliness of an appeal from an arbitration award that had been filed within 42 days of the entry of the final judgment on the award but not within 10 days of the entry of the final judgment. The Court of Civil Appeals determined that the effect of the 42-day appeal period allowed by Rule 4, Ala. R.App. P., was to expand the 10-day period specified under § 6-6-15, so that the appeal in that case was timely filed. Writing specially, Judge Murdock stated:
"Rule 4(a), Ala. R.App. P., provides, in pertinent part:
"`(1) Except as otherwise provided herein, in all cases in which an appeal is permitted by law as of right to the supreme court or to a court of appeals, the notice of appeal required by Rule 3[, Ala. R.App. P.,] shall be filed with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order appealed from....
"`(2) If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days (2 weeks) of the date on which the first notice of appeal was filed, or within the time otherwise prescribed by this rule, whichever period last expires.'
"(Emphasis added.) In the case of an arbitrator's award, the `judgment or order appealed from' is the final judgment of the court based on that award, not the award itself. Moss v. Upchurch, 278 Ala. 615, 619, 179 So.2d 741, 744-45 (1965).
"While § 6-6-15, Ala.Code 1975, still provides the right of appeal from a judgment based on an arbitrator's award and makes Sanderson's appeal one `permitted by law as of right,' the time for taking that appeal has been modified by virtue of and consistent with the above-quoted language in Rule 4(a)(1), Ala. R.App. P. As a result, not only has the time period for an appeal in connection with an arbitration award been expanded from the 10 days provided under § 6-6-15 to 42 days, that time period now begins to run under Rule 4(a)(1) from the date of entry of final judgment by the circuit court based on the arbitrator's award, rather than from the date of *42 receipt of the arbitrator's award as stated in § 6-6-15."
809 So.2d at 832 (Murdock, J., concurring specially in part, concurring in the result in part, and dissenting in part).
In considering the argument advanced by the plaintiffs, we are mindful of the overriding policy governing our application of the Rules of Appellate Procedure, that "[t]hey shall be construed so as to assure the just, speedy, and inexpensive determination of every appellate proceeding on its merits." Rule 1, Ala. R.App. P. It is undisputed that the News filed its notices of appeal in compliance with the requirements of § 6-6-15. We note further that Appendix II ("Statutes and Rules Superseded") and Appendix III ("Statutes Modified") to the Rules of Appellate Procedure do not list § 6-6-15 as among those statutes which have been superseded or modified by those rules. Thus, by adopting the view advocated by the plaintiffs we would invalidate the procedure set out by the Legislature to govern an appeal from an arbitration award, without there being any notice in the rules to that effect.
In H.L. Fuller Construction Co. v. Industrial Development Board of the Town of Vincent, 590 So.2d 218 (Ala.1991), the notice of appeal was filed pursuant to § 6-6-15 before the trial court had entered a judgment on the arbitrators' award, and this Court remanded the case for the trial court to enter the final judgment; on return to remand, this Court considered the merits of the appeal. No additional notice of appeal was required to be filed after the entry of the final judgment on remand. In Pruett v. Williams, 623 So.2d 1115 (Ala.1993), the Court accepted a notice of appeal filed "pursuant to § 6-6-15," after an arbitrator's award but before the entry of the award as a judgment of the circuit court, reasoning that when the award was later entered as a judgment of the circuit court, and the 10-day period provided by § 6-6-15 lapsed without the judgment's being set aside, "the judgment became final and the arbitration award appealable." 623 So.2d at 1116. Compliance with the statute made the award final and appealable when the trial court later entered its judgment upon the arbitrator's award.
The implicit recognition of the timeliness of the appeals in Fuller Construction and Pruett comports with the policy underlying the provision of Rule 4(a)(4), Ala. R.App. P., that "[a] notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after the entry and on the day thereof." Accordingly, we conclude that the notices of appeal filed by the News pursuant to § 6-6-15 became effective when the judgment on the arbitrators' award was entered and were thus timely filed. The plaintiffs' motion to dismiss the appeals as untimely is denied.

III. Standards of Review

A. Overview
Section 6-6-14, Ala.Code 1975, of the Alabama Arbitration Act, § 6-6-1 et seq., Ala.Code 1975 ("AAA"), sets out the factors to be considered in determining whether an arbitration award is conclusive:
"An award made substantially in compliance with the provisions of this division is conclusive between the parties thereto and their privies as to the matter submitted and cannot be inquired into or impeached for want of form or for irregularity if the award determines the matter or controversy submitted, and such award is final, unless the arbitrators are guilty of fraud, partiality, or corruption in making it."
The News does not argue that the arbitration awards in this appeal were the product of fraud, partiality, or corruption on the part of the arbitrators. It contends, *43 however, that our review of the awards should be governed by the standards prescribed by the FAA, as well as by several "nonstatutory" grounds, including allowing an arbitration award to be vacated when the arbitrators have been guilty of a "manifest disregard of the law."
The News asserts that the awards are due to be set aside pursuant to § 10(a)(4) of the FAA, which provides that an award may be vacated if "the arbitrators exceeded their powers." The News argues that the arbitrators here exceeded their powers (1) by consolidating the arbitration cases for hearing; (2) by "rewriting" paragraph 8 of the agreement in such a way as to ignore its plain meaning; and (3) by ignoring the provisions in paragraph 10 limiting the types of damages recoverable.
The News further asserts that the panel manifestly disregarded the law (1) by ignoring and disregarding Alabama law on when a limitation-of-damages provision in an arbitration clause is unenforceable as against public policy; (2) by disregarding basic contract law; (3) by disregarding the law on the issue of fraud; (4) by disregarding the law on the issue of conversion; (5) by disregarding the law on the issue of fiduciary duty; (6) by disregarding the law on the issue of damages; and (7) by awarding punitive damages "far out of proportion to the actual compensatory damages even arguably sustained" by the plaintiffs, resulting in a "multiple [which is] irrational and in manifest disregard of the law."
The News claims finally that each award fails to "derive its essence from the underlying contract," was "arbitrary and capricious," and was "completely irrational."
Because, as set forth in Part IV.E. of this opinion, we must affirm the awards predicated on the fraud claim upon application of the appropriate standard of review, subject to reductions to eliminate duplicative damages, and because the compensatory damages awarded for breach of contract, conversion, and breach of fiduciary duty are the same as those awarded on the fraud claim, we pretermit further discussion of those aspects of the standards of review urged upon us by the News applicable only to the breach-of-contract, breach-of-fiduciary-duty, and conversion claims.

B. Exceeded Powers
The plaintiffs assert that the grounds for review set out in the FAA are procedural rules, and, therefore, under the reasoning of Chief Justice Moore's dissent in Selma Medical Center, Inc. v. Fontenot, 824 So.2d 668 (Ala.2001), should not govern our substantive review in these cases; rather, argue the plaintiffs, only the § 6-6-14 grounds should apply.
The general structure of § 6-6-15 dates back more than 130 years. Before that, there were other statutory procedures for appealing an arbitration award; there was even a period between 1852 and 1868 when there were no provisions for taking an appeal from an arbitration award. Wright v. Bolton & Stracener, 8 Ala. 548 (1845); Wilbourn v. Hurt, 139 Ala. 557, 36 So. 768 (1904). Section 6-6-15 provides that either party may appeal from an arbitration award made under "this division" ["Arbitration and Award"], specifying the sequence and effect of the procedures to be followed. When, as in the present cases, an action is already pending in the circuit court, upon the filing of the notice of appeal with the circuit clerk, "together with a copy of the award, signed by the arbitrators or a majority of them ... the clerk or register shall enter the award as the judgement of the court." (Emphasis supplied.) (For many decades, the predecessors to § 6-6-15, up through Tit. 7 § 843 of the Code of Alabama of 1940 (Recomp.1958), assigned the duty of entering the judgment to "the clerk, register or *44 judge of the court." (Emphasis supplied.)) Section 6-6-15 states that if, within 10 days following the clerk's entry of the judgment, the circuit court does not set aside the award "for one or more of the causes specified in Section 6-6-14, the judgment shall become final and an appeal shall lie as in other cases." The News filed with the circuit clerk its "Motion to Vacate and Set Aside Arbitration Award" in each case, stating various grounds, but acknowledging its intention to pursue an appeal, and it contemporaneously filed its notice of appeal. The trial judge did not act within the 10-day period following the filing of the notices of appeal, but nothing in the record suggests that any of the motions to vacate were actually called to his attention.
The AAA has had throughout its history, until the last decade, a field of operation only with respect to post-dispute agreements to arbitrate. See Stone v. Dennis, 3 Port. 231 (Ala.1836); Bozeman v. Gilbert, 1 Ala. 90 (1840); and Headley v. Aetna Ins. Co., 202 Ala. 384, 80 So. 466, 467 (1918). Predispute agreements to arbitrate were invalid at common law, as the United States Supreme Court explained in Home Insurance Co. of New York v. Morse, 87 U.S. (20 Wall.) 445, 451, 22 L.Ed. 365 (1874):
"[A]greements in advance to oust the courts of the jurisdiction conferred by law are illegal and void.... [A citizen] cannot... bind himself in advance by an agreement, which may be specifically enforced, thus to forfeit his rights at all times and on all occasions, whenever the case may be presented."
Under the common law, even when the parties entered into a post-dispute agreement to arbitrate, either could back out of that agreement at any time before the dispute was actually submitted to arbitration and an award determined. See Aspinwall v. Tousey, 2 Tyl. 328 (Vt.1803); Allen v. Watson, 16 Johns. 205 (N.Y.Sup.Ct.1819); and Smith v. Compton, 20 Barb. 262 (N.Y. Gen. Term 1855).
Beginning with the Code of Alabama of 1923, the Alabama Code has included a statutory prohibition (now codified as § 8-1-41(3)) against the specific enforcement of a predispute agreement to submit a controversy to arbitration. However, through the combined holdings of several decisions of the United States Supreme Court, the application of that prohibition has been relegated to the rare case of a purely intrastate transaction that could not be said to "involve commerce" in any way. See Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); and Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003).
This Court held in Stewart, and Horn, supra, that the FAA preempted state law in the transactions between the News and the plaintiffs.
"Having held that the FAA is applicable to this case, we point out that its application is controlled by principles of `substantive federal law.' Ex parte Costa & Head [(Atrium), Ltd., 486 So.2d 1272], at 1275 [(Ala.1986)]. In cases governed by the FAA, the federal substantive law of arbitration governs, despite contrary state law or policy. Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); H.L. Fuller Construction Co. v. Industrial Development Board of the Town of Vincent, 590 So.2d 218 (Ala.1991). Further, the provisions of the FAA govern all questions of the validity, interpretation, construction and enforceability of the arbitration agreement. See Moses H. Cone Memorial Hospital v. Mercury *45 Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Willoughby Roofing & Supply Co. v. Kajima International, Inc., 598 F.Supp. 353 (N.D.Ala.1984), affirmed, 776 F.2d 269 (11th Cir.1985)."

Maxus, Inc. v. Sciacca, 598 So.2d 1376, 1379 (Ala.1992). In Fuller Construction, supra, decided the year before Maxus, the Court understood one of the appellant's contentions to be that
"the arbitration award is due to be vacated because it allegedly did not comply with the FAA, which permits the vacation of an arbitration award in the following instance:
"`(d) Where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'
"9 U.S.C. § 10(d) [redesignated by amendment as 9 U.S.C. § 10(a)(4)]."
590 So.2d at 223.
The Court determined, however, that on the limited record presented in that appeal, it was unable to say that the arbitrators had either exceeded their powers or imperfectly executed them.
In Maxus, after concluding that the FAA controlled its review, the Court went on to say:
"The FAA, specifically 9 U.S.C. § 10, permits the vacation of an arbitration award in the following instances:
"`(a) Where the award was procured by corruption, fraud, or undue means.
"`(b) Where there was evident partiality or corruption in the arbitrators, or either of them.
"`(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
"`(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'
"Where parties, as in this case, have agreed that disputes should go to arbitration, the role of the courts in reviewing the arbitration award is limited. Transit Casualty Co. v. Trenwick Reinsurance Co., 659 F.Supp. 1346 (S.D.N.Y.1987), affirmed, 841 F.2d 1117 (2d Cir.1988); Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577 (2d Cir.1967). On motions to confirm or to vacate an award, it is not the function of courts to agree or disagree with the reasoning of the arbitrators. Application of States Marine Corp. of Delaware, 127 F.Supp. 943 (S.D.N.Y.1954). Courts are only to ascertain whether there exists one of the specific grounds for vacation of an award. Saxis Steamship Co. A court cannot set aside the arbitration award just because it disagrees with it; a policy allowing it to do so would undermine the federal policy of encouraging the settlement of disputes by arbitration. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Virgin Islands Nursing Association's Bargaining Unit v. Schneider, 668 F.2d 221 (3d Cir.1981). An award should be vacated only where the party attacking the award clearly establishes one of the grounds specified above. Catz American Co. v. Pearl Grange Fruit Exchange, Inc., 292 F.Supp. 549 (S.D.N.Y.1968)."
598 So.2d at 1380-81.
More recently, in Mason v. Acceptance Loan Co., 850 So.2d 289 (Ala.2002), *46 after determining that the FAA was applicable to the arbitration provisions in the agreements between the parties, we commented in a footnote that the FAA, 9 U.S.C. § 10, would be applicable to a review of the arbitrators' award. 850 So.2d at 302 n. 10. In accord with Maxus and Fuller, supra, the Court of Civil Appeals has also concluded that the standards for reviewing an arbitration award set out in the FAA apply to an appeal of an arbitration award in which the underlying transaction involved interstate commerce. McKee v. Hendrix, 816 So.2d 30 (Ala.Civ.App.2001). See also Sanderson Group, supra (four judges concurring in the result). Therefore, it is well established that the standards set out in the FAA for reviewing an arbitrator's award are applicable to our review in this case.
To the extent that the limited grounds listed in § 6-6-14 (fraud, partiality, or corruption) might arguably govern judicial review of an arbitrator's award resulting from a post-dispute agreement to arbitrate when the parties have voluntarily opted for arbitration with full knowledge of the contours and significance of their dispute, those grounds do not provide adequate review of arbitrators' decisions in the numerous and varied commercial- and consumer-transaction disputes now being channeled to arbitration in this State through predispute agreements for arbitration.
Most states have adopted a version of the Uniform Arbitration Act ("UAA") drafted by the National Conference of Commissioners on Uniform State Laws in 1955. The UAA has undergone several revisions over the years, the most recent adopted by the Commissioners at their annual conference in 2000. However, since its promulgation in 1955 the UAA has always included a provision allowing for vacatur of an arbitration award where "[t]he arbitrators exceeded their powers." (Section 12(a)(3) of the 1955 version; Section 23(a)(4) of the 2000 version.) The "prefatory note" to the 2000 version states that "[f]orty-nine jurisdictions have arbitration statutes; 35 of these have adopted the UAA and 14 have adopted substantially similar legislation." Presumably Alabama is the excluded 50th jurisdiction, it being self-evident that the AAA is in no wise "substantially similar" to the UAA.
Although § 10 of the FAA facially is applicable only to the federal district courts, a number of other state appellate courts have adopted the same approach as this Court by recognizing the applicability of the § 10 standards in appeals in state courts from arbitration awards. E.g., Hecla Mining Co. v. Bunker Hill Co., 101 Idaho 557, 561, 617 P.2d 861, 866 (1980) ("federal law concerning the review of arbitrator's awards applies since the underlying factual situation here clearly concerns interstate commerce. Therefore we utilize the [FAA] and the cases thereunder instead of Idaho's enactment of the [UAA] . . . ."); Edward D. Jones & Co. v. Schwartz, 969 S.W.2d 788 (Mo.Ct.App.1998); Dowd v. First Omaha Sec. Corp., 242 Neb. 347, 495 N.W.2d 36 (1993); and Allen & Co. v. Shearson Loeb Rhoades, Inc., 111 A.D.2d 122, 489 N.Y.S.2d 500 (1985), aff'd, 67 N.Y.2d 709, 490 N.E.2d 850, 499 N.Y.S.2d 931 (1986). In Edward D. Jones v. Schwartz, supra, the Missouri Court of Appeals concluded that the provisions of § 10 represent substantive law, such that "the FAA governs the instant appeal." 969 S.W.2d at 795. Arguably, a similar approach is implicit in Fuller Construction, Maxus, and Mason, supra, but we need not stumble over the distinction between substantive law and procedural law in this particular context. This Court has adopted 9 U.S.C. § 10 as applicable to an appeal of an arbitration award in this state, and we see no need to retreat from *47 that position. (It is to be noted that the three grounds listed in § 6-6-14 for vacating an arbitration award  fraud, partiality, or corruption in making the award  are replicated in 9 U.S.C. § 10(a)(1) and (2).)
In general, the nature of the "exceeded powers" ground is described as follows:
"We have consistently accorded the narrowest reading to section 10(d) [currently section 10(a)(4)], especially when it has been invoked in the context of the arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance. Our inquiry under § 10(a)(4) thus focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue."
DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir.1997) (internal quotation marks and citations omitted).

C. Manifest Disregard of the Law
The ground of review based on manifest disregard of the law emerges from a comment in a 1953 opinion of the Supreme Court of the United States. In Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court, after noting that the power to vacate an arbitration award under § 10 of the FAA is limited, commented that "[i]n unrestricted submission, such as the present margin agreements envisage, the interpretations of the law by the arbitrators[,] in contrast to manifest disregard[,] are not subject, in the federal courts, to judicial review for error in interpretation." 346 U.S. at 436-37, 74 S.Ct. 182 (footnote omitted). That comment was essentially dictum; the expression "manifest disregard" of the law did not resurface in the writings of any of the Justices, in the context of arbitration procedures, until Justice Stevens made reference to it in his dissent in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 656-57, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Justice Stevens observed that "[a]rbitration awards are only reviewable for manifest disregard of the law, 9 U.S.C. §§ 10, 207, and the rudimentary procedures which make arbitrations so desirable in the context of a private dispute often mean that the record is so inadequate that the arbitrator's decision is virtually unreviewable." (Footnote omitted.) In Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Supreme Court concluded that the rationales recited by the Wilko Court in its decision on the merits reflected a general suspicion of the desirability of arbitration difficult to reconcile with the Court's subsequent decisions involving the FAA and with intervening regulatory developments. The Court therefore refused to "extend Wilko's reasoning." 482 U.S. at 234, 107 S.Ct. 2332. The Court did observe, however, that "there is no reason to assume at the outset that arbitrators will not follow the law." 482 U.S. at 232, 107 S.Ct. 2332. Justice Blackmun concurred in part and dissented in part, joined by Justices Brennan and Marshall, stating in the process that "[j]udicial review [of arbitration awards] is still substantially limited to the four grounds listed in § 10 of the [FAA] and to the concept of the `manifest disregard' of the law." 482 U.S. at 459, 107 S.Ct. 2502.
In 1989, the Court expressly overruled Wilko in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), holding that Wilko had been "incorrectly decided" as a result of the Wilko Court's outmoded suspicion of arbitration as a method of resolving disputes.
*48 The Supreme Court rehabilitated the Wilko concept of "manifest disregard" of the law, however, by the following statement in its unanimous opinion in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995):
"The party [who has agreed to arbitrate] still can ask a court to review the arbitrator's decision, but the court will set that aside only in very unusual circumstances. See, e.g., 9 U.S.C. § 10 (award procured by corruption, fraud, or undue means; arbitrator exceeded his powers); Wilko v. Swan, 346 U.S. 427, 436-37 (1953) (parties bound by arbitrator's decision not in `manifest disregard' of the law), overruled on other grounds, Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989)."
In none of these cases, however, did the Supreme Court discuss the meaning of "manifest disregard of the law," except to the extent of the discrimination in Wilko between "interpretations of the law" and "error in interpretation," on the one hand, and "manifest disregard" of the law, on the other. 346 U.S. at 436, 74 S.Ct. 182. Thus, lower courts have been left to "tease out" the meaning of that phrase.
When the United States Court of Appeals for the Eleventh Circuit elected to adopt the manifest-disregard-of-the-law standard in Montes v. Shearson Lehman Bros., 128 F.3d 1456, 1460 (11th Cir.1997), it observed that "every other circuit except the Fifth (which has declined to adopt any non-statutory grounds for vacating arbitration awards),[7] has expressly recognized that `manifest disregard of the law' is an appropriate reason to review and vacate an arbitration panel's decision." The Montes court emphasized that the Supreme Court had "reiterated" in First Options, supra, "that a party to arbitration can obtain relief from a federal court where the arbitration award was made in manifest disregard of the law." 128 F.3d at 1460. The court consequently concluded that "a manifest disregard for the law, in contrast to a misinterpretation, misstatement or misapplication of the law, can constitute grounds to vacate an arbitration decision." 128 F.3d at 1461-62. In embracing the standard, the court emphasized that "[a]n arbitration board that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake. To manifestly disregard the law, one must be conscious of the law and deliberately ignore it." 128 F.3d at 1461.
It may now be said that every federal circuit has expressly recognized "manifest disregard of the law" as a basis for vacating an arbitration award. Representative cases are as follows:
First Circuit  Bull H.N. Info. Sys., Inc. v. Hutson, 229 F.3d 321 (1st Cir.2000); JCI Communications, Inc. v. International Bhd. of Elec. Workers, Local 103, 324 F.3d 42 (1st Cir.2003).
Second Circuit  Halligan v. Piper Jaffray, Inc., 148 F.3d 197 (2d Cir.1998); GMS Group, LLC v. Benderson, 326 F.3d 75 (2d Cir.2003); Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383 (2d Cir.2003); Hoeft v. MVL Group, Inc., 343 F.3d 57 (2d Cir.2003).
Third Circuit  United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376 (3d Cir.1995) (the manifest-disregard-of-the-law standard was mentioned *49 only in a quote from an earlier Third Circuit case quoting other labor-law cases that are accorded a special status in the area of arbitration); Tanoma Mining Co. v. Local Union No. 1269, 896 F.2d 745 (3d Cir.1990); Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287 (3d Cir.2001).
Fourth Circuit  Upshur Coals Corp. v. United Mine Workers of America, Dist. 31, 933 F.2d 225 (4th Cir.1991); Remmey v. PaineWebber, Inc., 32 F.3d 143 (4th Cir.1994); Gallus Invs., L.P. v. Pudgie's Famous Chicken, Ltd., 134 F.3d 231 (4th Cir.1998).
Fifth Circuit  Williams v. Cigna Fin. Advisors, Inc., 197 F.3d 752 (5th Cir.1999); Prestige Ford v. Ford Dealer Computer Servs., Inc., 324 F.3d 391 (5th Cir.2003); Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347 (5th Cir.2003).
Sixth Circuit  Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132 (6th Cir.1996); M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d 844 (6th Cir.1996); Dawahare v. Spencer, 210 F.3d 666 (6th Cir.2000); Nationwide Mut. Ins. Co. v. Home Ins. Co., 330 F.3d 843 (6th Cir.2003).
Seventh Circuit  Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253 (7th Cir.1992); Eljer Mfg. Co. v. Kowin Dev. Corp., 14 F.3d 1250 (7th Cir.1994).
Eighth Circuit  Lee v. Chica, 983 F.2d 883 (8th Cir.1993); Schoch v. InfoUSA, Inc., 341 F.3d 785 (8th Cir.2003).
Ninth Circuit  Barnes v. Logan, 122 F.3d 820 (9th Cir.1997); G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096 (9th Cir.2003); Coutee v. Barington Capital Group, L.P., 336 F.3d 1128 (9th Cir.2003).
Tenth Circuit  Jenkins v. Prudential-Bache Sec., Inc., 847 F.2d 631 (10th Cir.1988); Denver & Rio Grande Western R.R. v. Union Pacific R.R., 119 F.3d 847 (10th Cir.1997).
Eleventh Circuit  Montes, supra; Scott v. Prudential Sec., Inc., 141 F.3d 1007 (11th Cir.1998).
D.C. Circuit  Sargent v. Paine Webber Jackson & Curtis, Inc., 882 F.2d 529 (D.C.Cir.1989); Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175 (D.C.Cir.1991).
As exemplified by the variety of settings out of which "arbitration cases" come to this Court, mandatory arbitration clauses, which traditionally were utilized almost exclusively in the securities industry and arm's-length commercial transactions, are now prevalent in a variety of other areas, including employment, insurance policies, nursing home admissions, automobile purchases, and manufactured-home purchases. One need only consider the complexity of legal theories and the large sums of money involved in the cases now before us to realize that failure to provide the additional, albeit extremely limited, nonstatutory ground of review of a manifest disregard of the law for the review of an arbitration award could potentially conflict with the goals and policies of the FAA. Carte blanche judicial approval of decisions rendered by arbitrators not shown to have been guilty of fraud, partiality, or corruption and not made "in excess of the arbitrator's powers," but that egregiously and manifestly depart from clearly established law of which the arbitrators were patently aware, would serve only to undermine the public's confidence in the arbitration process. See Saturn Constr. Co. v. Premiere Roofing Co., 238 Conn. 293, 305, 680 A.2d 1274, 1281 (1996).
Like the federal courts of appeals discussed earlier, many state appellate courts have elected to adopt the manifest-disregard-of-the-law standard as a legitimate standard for review of arbitration awards. *50 See, e.g., Saturn Constr. Co. v. Premier Roofing Co., 238 Conn. 293, 680 A.2d 1274 (1996); Amerispec Franchise v. Cross, 215 Ga.App. 669, 452 S.E.2d 188 (1994); Hecla Mining Co. v. Bunker Hill Co., 101 Idaho 557, 617 P.2d 861 (1980); Welch v. A.G. Edwards & Sons, Inc., 677 So.2d 520, 524 (La.Ct.App. 4th Cir.1996) ("The doctrine implies that the arbitrator appreciates the existence of clearly governing legal principle but decides to ignore or pay no attention to it.") Edward D. Jones & Co. v. Schwartz, 969 S.W.2d 788 (Mo.Ct.App.1998); Geissler v. Sanem, 285 Mont. 411, 949 P.2d 234 (1997); Graber v. Comstock Bank, 111 Nev. 1421, 1428, 905 P.2d 1112, 1116 (1995) (ground established when arbitrators "appreciate the significance of clearly governing legal principles but decide to ignore or pay no attention to those principles. The governing law alleged to have been ignored must be well-defined, explicit, and clearly applicable." (Citations omitted.)) Sawtelle v. Waddell & Reed, Inc., 304 A.D.2d 103, 754 N.Y.S.2d 264 (2003); Altieri v. Liberty Mut. Ins. Co., 697 A.2d 1104 (R.I.1997); City of Madison v. Madison Prof. Police Officers Ass'n, 144 Wis.2d 576, 425 N.W.2d 8 (1988); and Employers Ins. of Wausau v. Certain Underwriters at Lloyd's London, 202 Wis.2d 673, 689, 552 N.W.2d 420, 426 (Wis.Ct.App.1996) ("our supreme court noted that [the Wisconsin statutory counterpart to FAA § 10] echoes the common law standards, implying that if an arbitrator manifestly disregarded the law, the arbitrator exceeded the scope of his powers, requiring vacatur under [that counterpart]"). See also Buzas Baseball, Inc. v. Salt Lake Trappers, Inc., 925 P.2d 941, 951 (Utah 1996) (discussing nature of doctrine of manifest disregard of the law, and opining that "[i]f arbitrators manifestly disregard the law in making their award, they can be said to have exceeded their authority," but reserving the issue whether the ground was recognized in Utah because there was no evidence indicating that the arbitration panel manifestly disregarded any aspect of the law).
This Court joins the majority of other state appellate courts that have considered the matter in now recognizing "manifest disregard of the law" as a ground available for reviewing an arbitration award. As have all other courts, state and federal, that have recognized this ground, however, we emphasize that judicial review under it is severely limited and that the party challenging an award on this ground bears a heavy burden. GMS Group, LLC v. Benderson, supra; Prestige Ford v. Ford Dealer Computer Servs., Inc., supra; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir.1995); Hoffman v. Cargill, Inc., 236 F.3d 458, 461 (8th Cir.2001); Montes v. Shearson Lehman Bros., supra; Edward D. Jones v. Schwartz, supra. Although there are variations of the standard as formulated by the various courts, those formulations share the commonality that an arbitration award should be vacated only if the arbitrators knew of a well-defined and explicit governing legal principle, clearly applicable to the circumstances at hand, yet chose to ignore that principle or refused to apply it.
"[A] party seeking to vacate an arbitration award on the basis of manifest disregard of the law must satisfy a two-pronged test. The party must prove that: `(1) the arbitrator[] knew of a governing legal principle yet refused to apply it or ignored it all together, and (2) the law ignored by the arbitrator[] was well defined, explicit, and clearly applicable to the case.' Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir.1998) (citation omitted)."
Hoeft v. MVL Group, Inc., 343 F.3d at 69.
"When faced with questions of law, an arbitration panel does not act in manifest *51 disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refuse to heed that legal principle."
Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d at 421.
"`Manifest' means `[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, undubitable, indisputable, evident, and self-evident.' Black's Law Dictionary 962 (6th ed. 1990). See also American Heritage Dictionary of the English Language 794 (New College ed. 1981) (`Clearly apparent to the sight or understanding; obvious.'). `Disregard,' in turn, means `[t]o treat as unworthy of regard or notice; to take no notice of; to leave out of consideration; to ignore; to overlook; to fail to observe,' Black's Law Dictionary at 472; see also American Heritage Dictionary at 381 (`To pay no attention or heed to; fail to consider; ignore.'). An arbitration board that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake. To manifestly disregard the law, one must be conscious of the law and deliberately ignore it. See O.R. Sec.[, Inc. v. Professional Planning Assocs., Inc.], 857 F.2d [742] at 747 [(11th Cir.1988)] (`there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it.').... We conclude that a manifest disregard for the law, in contrast to a misinterpretation, misstatement or misapplication of the law, can constitute grounds to vacate an arbitration decision. We emphasize again that this ground is a narrow one."
Montes, 128 F.3d at 1461-62 (footnote omitted).
To avoid summary confirmation of an arbitration award, a party "must show that `a governing legal principle is well defined, explicit, and clearly applicable to the case, and ... the arbitrator ignored it after it was brought to the arbitrator's attention in a way that assures that the arbitrator knew its controlling nature.'" GMS Group, LLC, 326 F.3d at 81 (quoting Goldman v. Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir.2002)).
"Manifest disregard of the law means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law. It must be clear from the record that the arbitrators recognized the applicable law and then ignored it. There is no manifest disregard of the law where an arbitration panel distinguishes prior caselaw from the situation before them, or where there is substantial authority sustaining the arbitrators' assumption as to the law. Under the manifest disregard of the law standard of review, in order to prove that the arbitrator both recognized and ignored the applicable law, there must be a showing in the record other than the result reached by the arbitrator."
1 Gabriel M. Wilner, Domke on Commercial Arbitration § 38:9 (footnotes, citing to supporting caselaw, omitted).
In Montes, supra, in deciding to depart from precedent,[8] the Eleventh Circuit Court of Appeals made the following pertinent observations:
"When a claim arises under specific laws, however, the arbitrators are bound *52 to follow those laws in the absence of a valid and legal agreement not to do so. As the Supreme Court has stated, `[b]y agreeing to arbitrate a statutory claim, a party does not [forgo] the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991)(quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 3354-55, 87 L.Ed.2d 444 (1985)). Similarly, in Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Court stated `we have indicated that there is no reason to assume at the outset that arbitrators will not follow the law; although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute,' id. at 232, 107 S.Ct. at 2340 (citing to and summarizing Mitsubishi Motors).
"This does not mean that arbitrators can be reversed for errors or misinterpretations of law. In Wilko v. Swan, 346 U.S. 427, 436-37, 74 S.Ct. 182, 187-88, 98 L.Ed. 168 (1953), overruled on other grounds, Rodriguez de Quijas v. Shearson/American Exp., Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), the Supreme Court indicated that although an erroneous interpretation of the law would not subject an arbitration award to reversal, a clear disregard for the law would. As the Wilko court stated, `[i]n unrestricted submission,. . . the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation.' Wilko, 346 U.S. at 436-37, 74 S.Ct. at 187-88 (citation omitted). The Supreme Court has recently reiterated that a party that submits to arbitration may obtain relief from a federal court `only in very unusual circumstances,' but that a party to arbitration can obtain relief from a federal court where the arbitration award was made in manifest disregard of the law. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995) (citing to Wilko)."
128 F.3d at 1459-60.
Having considered all of the variations in wording of the standard different courts have employed, we find the most succinct statement of the standard to be as phrased by the United States Court of Appeals for the Second Circuit, in Halligan, 148 F.3d at 202: a party seeking to vacate an arbitration award on the basis of manifest disregard of the law must establish that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case,"[9] citing DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir.1997); see also Hoeft, 343 F.3d at 69.

D. Arbitrary, Irrational, and Failure to Derive Essence
The News, in addition to asserting that the arbitrators exceeded their powers and acted in "manifest disregard of the law," claims that each award fails to "derive its essence from the underlying contract," was "arbitrary and capricious," and was "completely irrational." See William H. Hardie, Arbitration: Post-Award Procedures, *53 60 Ala. Law. 314, 322-23, for a general discussion of these grounds. We decline the News's invitation to adopt any of these other grounds of review. We deem these grounds too vague for application in the context of arbitration awards where the arbitrators have neither exceeded their powers nor manifestly disregarded the law. Professor Stephen L. Hayford, a recognized authority on judicial review of arbitration awards, after noting that only a few federal circuits have adopted these grounds, offered the following thoughtful analysis of their "problematical nature":
"The case law from the several federal courts of appeals embracing the `other' nonstatutory grounds for vacatur reveals no unifying theory explaining or justifying that judicial tack. Nevertheless, it seems clear that the three nonstatutory grounds for vacatur of commercial arbitration awards beyond the `manifest disregard of the law' and `public policy' grounds are largely the product of judicial efforts to draw a line between `routine' arbitral missteps that do not warrant vacatur of the award and arbitral errors of law, contract interpretation, or fact so calamitous as to compel a reviewing court to intervene, presumably in the name of justice, and overturn the arbitral result. . . .
". . . .
"The undisciplined approach to judicial decisionmaking reflected in the case law recognizing the `other' nonstatutory grounds for vacatur gives rise to the second primary problem they present. The mode of analysis described above has produced a number of imprecise legal standards that furnish the lower courts and the practicing bar with little useful guidance in their tasks of distinguishing between commercial arbitration awards that are seriously flawed and therefore likely subject to vacatur and those that are not. . . .
"Judicial attempts to clarify the precise parameters of a court's inquiry under the `other' nonstatutory grounds reflected in the case law reviewed above invariably fail to provide the lower courts and the commercial arbitration bar with objective, easily identifiable standards for determining when a petition for vacatur should succeed. Instead, these opinions have done little more than furnish rhetorical `hooks' for efforts at securing reversal of the offending arbitration awards. The preceding review of the relevant case law demonstrates that attempts at achieving vacatur under the `other' nonstatutory grounds are almost always futile.
"Why courts, when presented with petitions for vacatur intoning one or more of the `other' nonstatutory grounds, do not simply note that the standard(s) relied upon by the petitioner is (are) nowhere contemplated in the FAA or the law of commercial arbitration and then proceed to summarily dismiss the underlying petitions is puzzling indeed. Instead, the courts recognizing these grounds typically engage in an analysis of the cited ground for vacatur, endeavor to fashion standards for distinguishing between awards that warrant vacatur and those that do not, and then note that the articulated test for vacatur is not satisfied. After a circuit first addresses one of the `other' nonstatutory grounds, advocates who wish to take issue with the merits of an unfavorable commercial arbitration award are provided with ready-made commercial arbitration case authority upon which to base such a challenge.
"Given the imprecise, highly subjective character of the `arbitrary and capricious award,' the `clearly irrational award,' and the `essence of the agreement' standards, it is not surprising that *54 a party dissatisfied with a commercial arbitration award often finds irresistible the temptation to attempt to convince a reviewing court that the arbitrator's resolution of the dispute before him was so seriously marred by an error of law, contract, or fact as to warrant vacatur in the interest of justice. Until the federal courts of appeals that have adopted the `other' nonstatutory grounds squarely confront and address this reality and the highly dubious presumption of an identity between commercial and labor arbitration, the destabilizing effect of these constructs on commercial arbitration is certain to limit the move toward institutionalizing the commercial arbitration process as a viable and effective substitute for traditional litigation."
(Emphasis added.) Stephen L. Hayford, A New Paradigm for Commercial Arbitration: Rethinking the Relationship Between Reasoned Awards and the Judicial Standards for Vacatur, 66 Geo. Wash. L.Rev. 443, 489-93 (1998).

IV. Application of Standards to the News's Challenges to the Arbitration Awards

A. Challenges to the Award of Damages Pursuant to the Breach-of-Contract, Conversion, and Breach-of-Fiduciary-Duty Claims
Because of our disposition of the fraud claim in Part IV.E. of this opinion, where we uphold the award of compensatory and punitive damages made as a result of a finding for the plaintiffs on that claim, as adjusted to eliminate duplication of damages, we pretermit consideration of the challenges to the award of the same damages under the breach-of-contract, conversion, and breach-of-fiduciary-duty claims. Even if we upheld every challenge the News makes to those claims and disallowed any recovery under them, the same recoveries separately sustainable under the fraud claim would, in the final analysis, leave the awards fully intact.

B. Did the Arbitrators Exceed Their Powers in Consolidating the Cases?
The News asserts that the arbitrators exceeded their power in consolidating the arbitration cases for hearing.
The panel's prehearing order consolidating the cases stated, in pertinent part:
"The Panel has determined that the parties shall consolidate procedurally all matters possible without compromising substantive rights of either party. Either party will be heard as the cases proceed on the issue of whether substantive rights of the parties are being abrogated on a case by case, issue by issue basis."
The News contends that the hearing "degenerated into a de facto consolidation of all of the cases." The agreement does not expressly permit or prohibit consolidation of cases submitted to arbitration. The News relies principally on Protective Life Insurance Corp. v. Lincoln National Life Insurance Corp., 873 F.2d 281 (11th Cir.1989), for its argument that absent a provision in the arbitration agreement allowing for consolidation the arbitrators had no authority to consolidate the cases. In Protective Life, a panel of the United States Court of Appeals for the Eleventh Circuit determined that, under § 4 of the FAA "the power of federal courts is `narrowly circumscribed'" to determining if an arbitration agreement exists and, if so, to directing the parties to proceed to arbitration in accordance with the terms of the arbitration agreement, and that therefore, if the arbitration agreement does not include a provision for consolidation, "federal courts may not read [such a provision] in." 873 F.2d at 282. This holding does not address the power of an arbitrator, as distinct from a federal district judge, to consolidate claims for *55 hearing. "`"[P]rocedural" questions which grow out of the dispute and bear on its final disposition' are presumably not for the judge, but for an arbitrator, to decide." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). To like effect see Dean Witter Reynolds, Inc. v. McDonald, 758 So.2d 539, 542 (Ala.1999); and Southern United Fire Insurance Co. v. Howard, 775 So.2d 156, 163-64 (Ala.2000). The UAA, as revised in 2000, provides in § 10 that "consolidation of separate arbitration proceedings" may be ordered where four criteria are satisfied, all of which are satisfied in the present arbitration proceeding. At the hearing, the panel employed the rule of witness exclusion, so that no plaintiff was allowed to sit in on another plaintiff's testimony, until the former plaintiff had testified. In Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 449, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), the United States Supreme Court made these comments in concluding that an arbitrator, not a court, should decide the question of contract interpretation involved in the issue whether "class arbitration" could take place: "[T]he relevant question here is what kind of arbitration proceeding the parties agreed to.... [That question] concerns contract interpretation and arbitration procedures. Arbitrators are well situated to answer that question." (First emphasis original; second emphasis added.) Accordingly, based on this state of the law, we cannot say that the arbitrators exceeded their powers in consolidating the cases for purposes of holding one hearing; in doing so they were exercising their discretion in structuring arbitration procedures.

C. Did the Arbitrators Exceed Their Powers or Act in Manifest Disregard of the Law in Exceeding the Limitation of Damages in the Agreements?
As noted, paragraph 10 provides: "In any event, News Dealer shall not claim any additional compensation for good will, but acknowledges that his entire compensation under this agreement is the difference between the wholesale and resale price of the newspapers purchased and sold by him."
The News argues that this provision precluded the plaintiffs from claiming "damages for goodwill, mental anguish, or, for that matter, punitive damages." Certainly paragraph 10 is reasonably susceptible of the interpretation that a dealer's sole redress for any breach of the agreement or for any tortious conduct by the News, no matter how wrongful, would be the "compensation" otherwise due under the arrangement between the parties. The agreement, by its literal terms, purports to grant the dealer only the right to purchase newspapers from the News at a prescribed wholesale rate, to sell them to subscribers and customers in their assigned area for the "suggested resale price," and to pay the News for those newspapers by the 10th day of each month. The agreement specifies that it is up to the dealer to "collect money in payment of such copies of said newspapers." The actual practice relating to collections as found by the panel, however, was as follows:
"Dealers receive a monthly bill from The News. This bill charges the dealer for papers sold to him during the preceding month. It also debits the dealers for a bond, the cost of supplies or equipment and other specified charges. Generally, however, this bill reflects a credit balance for the dealer since the dealer is given credit for all monies paid to The News by customers in the dealer's given area."
Accordingly, construing the subject provision of paragraph 10 in the context of the *56 parties' practice of a monthly "settling up," the panel could have understood the provision to limit a dealer's remedy against the News in contract or tort to that monthly "credit balance for the dealer" that might exist at any given time. That sum, of course, would already be due the dealer, independent of any civil wrong by the News.
The panel found the provisions in question to be "invalid and void as contrary to public policy," citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., supra; Ex parte Celtic Life Insurance Co., 834 So.2d 766 (Ala.2002); Ex parte Thicklin, 824 So.2d 723 (Ala.2002); Cavalier Manufacturing, Inc. v. Jackson, 823 So.2d 1237 (Ala.2001), cert. denied, 535 U.S. 986, 122 S.Ct. 1536, 152 L.Ed.2d 464 (2002), overruled on other grounds, Thicklin, supra; and American General Finance, Inc. v. Branch, 793 So.2d 738 (Ala.2000). The News argues that the arbitrators exceeded their powers, citing Vulcan Chemical Technologies, Inc. v. Barker, 167 F.Supp.2d 867 (W.D.Va.2001), vacated on other grounds, 297 F.3d 332 (4th Cir.2002), and Amanda Bent Bolt Co. v. International Union, United Automobile, Aerospace, Agricultural Implement Workers of America Local 1549, 451 F.2d 1277 (6th Cir.1971). The News acknowledges that the district court's decision in Vulcan Chemical was vacated in its entirety by the Fourth Circuit Court of Appeals. Therefore that decision cannot stand as authority for anything. In Amanda Bent Bolt a labor arbitrator awarded relief explicitly prohibited under an agreement that also specified that the arbitrator would have "`no power to add to, subtract from or modify any of the terms of this agreement.'" 451 F.2d at 1280. Thus, the arbitrator's action, by the express terms of the underlying agreement, exceeded his power. The News also asserts that the arbitrators disregarded Leonard v. Terminix International Co., 854 So.2d 529 (Ala.2002). The News quotes from that case, however, only the statement that "limitations on damages that may be recovered are not, per se, against public policy," 854 So.2d at 534, and summarizes its holding as being that "an arbitration clause is not unconscionable solely because it purports to preclude a particular remedy or limit damages." The arbitration panel did not express its holding in terms of a per se violation of public policy; many factors can enter into a determination that contractual terms are contrary to public policy. As noted, the panel cited American General Finance, supra, in support of its finding. That case explained the multi-factorial analysis appropriate in assessing an arbitration award for unconscionability. Thus, constrained by the limited reach of our review under the "exceeded powers" ground, we cannot say that the arbitration panel exceeded its authority, in the face of Leonard, by holding the provision invalid and void as unconscionable. Likewise, the News's alternative approach of arguing that the arbitration panel manifestly disregarded the law of Leonard must fail. Leonard, like American General Finance, lists various considerations attending a determination of unconscionability. Further, because Leonard was not released until after the panel had issued its decision, it was not available to the panel to be "disregarded."

D. Did the Arbitrators Manifestly Disregard the Law Regarding the Statute of Limitations for Fraud?
The News's argument concerning the arbitration panel's alleged manifest disregard of the law relating to the statute of limitations for fraud consists in its entirety of the following:
"The Panel also manifestly disregarded the statute of limitations applicable to *57 fraud claims in the state of Alabama. In 1995, over seven years ago, The News sent letters to all dealers and distributors (including [the plaintiffs]) concerning the zip code change. (Exhibit A to this brief.) If, as the [plaintiffs] now contend, they believed The News had no right to change any term of the agreement at its expiration (including the area of primary responsibility), that letter should have put them on notice that The News held a different view.
"The statute of limitations for a fraud claim in Alabama is two years. Ala.Code § 6-2-3 (1975). The first of these cases was filed in 1999. The limitations period for [the plaintiffs'] fraud claims expired well before they commenced an action."
We note the absence of citation to caselaw. The letter attached as an exhibit to the News's brief explained to dealers that, when their existing agreements expired, a reorganization of their distribution area along zip-code lines might be necessary to meet the requirements of advertisers. Section 6-2-3 is a tolling statute, under which a "claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." The argument presented on this point, devoid of any discussion of the extensive body of caselaw that has developed concerning just what constitutes a "discovery" of fraud, does not satisfy the stringent standard for establishing a manifest disregard of the law.

E. Did the Arbitrators Manifestly Disregard the Law Regarding the Fraud Claim?
The only laws relating to fraud the News argues that the arbitration panel disregarded are (1) the law of "promissory fraud"; (2) application of the two-year statute of limitations prescribed for fraud claims by § 6-2-3, Ala.Code 1975; and, (3) in relation to the fraud claim asserted by Teresa McLendon, the elements of misrepresentation and detrimental reliance. Additionally, the News contends:
"The Panel also failed to even consider how the actions of the News in these cases were in any way inconsistent with the representations allegedly made. The News offered to renew the dealer agreements of the four appellees, Horn, Glass, Jay, and Teresa McLendon, who were performing satisfactorily. Nothing in the record suggests that the News ever said anything that could be rationally construed to promise that not one word of the agreement originally signed would ever be changed as part of a renewal offer."
We cannot discern from this latter argument exactly what "law of fraud" the News argues the panel manifestly disregarded. No citation to statutory or case authority is provided. This failure detracts from a focused appellate review. See Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82 (Ala.2003). Horn, Glass, James McLendon, and Teresa McLendon declined to "renew" their agreements by executing revised agreements, because the News insisted in the revised agreements that the first sentence of paragraph 8 be changed to eliminate any possibility of an automatic renewal. The News does not take the position that it had at one time intended to honor the right of a dealer to an automatic renewal in the absence of the failure of the dealer to perform satisfactorily, but later changed its mind; rather, it insists that at no time did it intend for a dealer to have a right to an automatic renewal.
A claim of promissory fraud is "based upon a promise to act or not to act *58 in the future." Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988).
We agree with the News that the plaintiffs' fraud claims arising from the News's alleged misrepresentation that their dealer agreements would be automatically renewed from year to year if they fully performed their dealer obligations constitute allegations of promissory fraud.
In its decision, the arbitration panel addressed the fraud claims in this manner:
"Under Alabama law, a cause of action for fraud based upon a misrepresentation arises where a party reasonably relies upon a misrepresentation of a material fact and suffers damage because of his or her reliance. Ex parte ERA Marie McConnell Realty, Inc., 774 So.2d 588, 591 (Ala.2000).
"The News consistently represented to dealers, including plaintiffs, that the Dealer Agreements would be maintained so long as the dealer performed satisfactorily. The News'[s] practice concerning renewals was consistent with that representation. That representation was false. The News knew that this representation was false when it was made at the commencement of each plaintiffs' dealership relationship and when it was consistently reaffirmed by The News during the so-called annual renewal meetings with The News'[s] circulation department managers.
"Plaintiffs relied on those representations in going forward with the purchase of their branches and in entering into the Dealer Agreements. Plaintiffs also relied on those representations by devoting their lives and fortunes to build their businesses, acting in reliance on the News'[s] repeated assurances that the contractual relationship was a lasting one and was not subject to unilateral termination without cause. The plaintiffs gave The News the highest form of loyalty  blood, sweat and tears in the service of their businesses. Their reward in exchange for this loyalty was a discovery during Toby Pearson and Jim Keeble's reign that they had been duped. These false representations were intended by The News to allow it to `have its cake and eat it too.'
"The Panel concludes that The News committed actionable fraud against the plaintiffs. As such, having established that The News is guilty of fraud, then the plaintiffs are entitled to recover for such actual damages that they suffered. These damages include plaintiffs' loss of investments and loss of income streams, as well as plaintiffs' mental anguish.
"In addition to actual damages, punitive damages are available in a fraud action where the plaintiff proves by clear and convincing evidence that the wrongdoer's conduct is malicious, oppressive, or gross, and that the misrepresentation that is the basis of the fraud is made with the knowledge of falsity and with the purpose of injuring the party. Ala.Code 1975 § 6-11-20.
"Plaintiffs would not have gone forward with the purchases of their branches had the truth been disclosed. Likewise, they would have attempted to sell their dealerships in the open marketplace had they known that the market value for these dealerships was about to be abruptly destroyed by the changes in the automatic renewable term provision as explained to them by News employees clearly enhances the values of their franchises [sic]. It was only after investing large sums of money into businesses plaintiffs considered to be lifelong that The News chose to disclaim any significance of the automatic renewable provision. The News insists that it has always been its practice to emphasize the one-year aspect of the Dealer *59 Agreement to prospective dealers. The Panel heard no credible evidence supporting this contention. Thus, the Panel concludes that The News'[s] misrepresentations regarding the Dealer Agreement were made knowingly, and that punitive damages are recoverable by plaintiffs for such conscious misrepresentations."
"In order to prove a claim for promissory fraud, the plaintiff must prove:
"`(1) [T]hat the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was made with a present intent to deceive; and (5) that when the representation was made the defendant intended not to perform in accordance with it.'
"Howard v. Wolff Broadcasting Corp., 611 So.2d 307, 311 (Ala.1992) (emphasis omitted), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993), cert. denied sub nom. I.M.T.C., Inc. v. N.L.R.B., 507 U.S. 1032, 113 S.Ct. 1851, 123 L.Ed.2d 474 (1993)."
Arthur Rutenberg Homes, Inc. v. Norris, 804 So.2d 180, 184 (Ala.2001).
All in all, it is clear that the panel found that at the time of the misrepresentations the News had the intention not to be bound by its promise of automatic renewal in the absence of "cause" not to renew and that it intended to deceive the plaintiffs in that regard.
We must accord great weight to the arbitration panel's factual findings. Some courts have concluded that an arbitrator's findings of fact are virtually unassailable.
"Under the manifest disregard standard ... the governing law must clearly apply to the facts of the case, as those facts have been determined by the arbitrator. See Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc., 274 F.3d 34, 36-37 (1st Cir.2001) (`An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbitrator found them.')."
Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 213 (2d Cir.2002). "We accept the facts as the arbitrator found them." Boston Med. Ctr. v. Service Employees Int'l Union, Local 285, 260 F.3d 16, 18 (1st Cir.2001).
In the consolidated hearing of the six arbitration cases, the arbitration panel heard ore tenus testimony from all witnesses except Horn, who testified by deposition. At the very least, we would accord the panel's factual findings derived from the testimony of the "live" witnesses the deferential review such findings are owed under the ore tenus standard. SouthTrust Bank v. Copeland One, L.L.C., 886 So.2d 38 (Ala.2003); Aetna Life Ins. Co. v. Character, 873 So.2d 1075 (Ala.2003); and Ex parte Lamar Adver. Co., 849 So.2d 928 (Ala.2002). Of course, we have no occasion to evaluate the evidence in any way unless that issue is properly before us as a legitimate component of a legally cognizable ground of arbitral review.
The only attack the News makes on the panel's findings relating to the elements of promissory fraud is by way of the following paragraph in its initial brief to this Court:
"The Panel's findings with regard to present intent, if it can be called a finding, make no sense whatsoever. The Panel found that The News had represented to the appellees that the dealer agreements would be maintained so long as the dealer performs satisfactorily. The Panel then found that The News'[s] practice was consistent with that representation. *60 The Panel does not explain, nor could it, how The News having acted in a manner consistent with the representation it allegedly made could somehow show an intent to deceive or not to perform. If anything, The News having acted in such a manner would show an absence of an intent to deceive. The appellees themselves testified that they did not believe any employee of The News was out to deceive them when they first signed a dealer agreement."
We again note the absence of any citation to authority. The News does not acknowledge the fact that when Keeble was given the responsibility for continuing the dealers' contracts he took the position on behalf of the News that the plaintiffs had never had any right to an automatic renewal and had never had any property interest in their branches other than in the unexpired portion of the one-year term. With respect to the argument that the plaintiffs "themselves testified that they did not believe any employee of the News was out to deceive them when they first signed a dealer agreement," the evidence to which the parties' briefs draw our attention involves different statements by different employees of the News to different plaintiffs at different times and places, and the various plaintiffs testified that they either had no reason to believe that the particular employee did not believe what he or she was saying at the time, or they simply did not know what that employee's belief was. At any rate, the following legal principles are pertinent to a situation where a plaintiff alleging promissory fraud against a corporation has received an innocent misrepresentation by one of the corporation's employees:
"This court has, as most others, repeatedly held that a corporation cannot escape liability in fraud cases by showing that the agent through whom it acted was without knowledge of the true facts. The issue in those cases is whether the corporation had knowledge of the true facts."
Shelter Modular Corp. v. Cardinal Enters., Inc., 347 So.2d 1334, 1338 (Ala.1977).
"[W]e emphasize that the only two defendants against whom the plaintiffs have asserted claims were Leisure American and Alpine Bay [both corporations]; no individuals were named as defendants. . . . [T]he beginning point of our analysis focuses on the conduct, particularly the intent, of Alpine Bay, a corporate entity, as made known through the conduct of its agent and not the intent of individual agents themselves who are not defendants.

". . . .
"It is axiomatic that a corporate employee's individual defense of lack of intent does not of itself end the inquiry with respect to the corporation's requisite intent to defraud. The corporation is acting as a legal entity and, if an individual corporate agent's conduct, though not fraudulent of itself, combines with the conduct of other corporate agents so as to amount to corporate fraud, the corporation may not escape liability simply by pointing to one innocent link in the chain. . . .
"....
"Alpine Bay mistakenly sets forth the promissory fraud issue as whether there is sufficient evidence to support the finding that [its two agents], acting for Alpine Bay, intended to deceive [the plaintiffs] and intended not to perform the repurchase agreement at the time it was made. The correct question is whether Alpine Bay had the requisite intent to defraud the plaintiffs."
Leisure American Resorts, Inc. v. Knutilla, 547 So.2d 424, 425-26 (Ala.1989).
*61 This Court accepted the fact in Leisure American that "the corporation's left hand did not know what its right hand was doing," 547 So.2d at 427, but concluded that that circumstance did not insulate the corporation from liability.
In the final analysis, the News makes no real argument concerning the sufficiency of the fraud evidence presented at the arbitration hearing. Although its above-quoted argument portrays the two specified findings by the panel as logically incompatible, that criticism does not in any way serve to present a claim that the evidence presented at the hearing was insufficient to prove the elements of promissory fraud. Without suggesting that such an evidentiary insufficiency would in fact constitute a manifest disregard of the law with respect to the panel's holdings on the fraud claims, we simply point out that the question of the sufficiency of the evidence to support those holdings (except as to Teresa McLendon) is not a matter we are called upon to consider.
It is important to note another issue not raised in these appeals. The News does not refer to, or in any way rely on, the legal proposition that "fraud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement." Tyler v. Equitable Life Assurance Soc. of the United States, 512 So.2d 55, 57 (Ala.1987). "It has been generally held that, when a person signs a writing containing language that is clearly contrary to pre-execution parol representation, reliance is unjustified." Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746, 749 (Ala.1990). (The "justifiable reliance" standard for evaluating reliance in fraud cases was supplanted by the "reasonable reliance" standard in Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997).) If, as a matter of contract law, as the News contends, paragraph 8 unambiguously granted either party the right to terminate the agreement as of any annual renewal date by the simple expedient of timely notice, and because it is undisputed that each of the plaintiffs read paragraph 8 before they signed their respective agreements, some even initialing that paragraph, significant questions of reasonable reliance would have been at issue. As previously noted, our disposition of the fraud claim makes it unnecessary to reach the contract claim because the same compensatory damages are recoverable under either claim. We make this observation concerning the absence of any issue about "reasonable reliance" (except, incidentally, as to Teresa McLendon), to head off any possible misapprehension by the bench and bar that we are somehow implicitly recognizing an exception to reasonable-reliance requirement in fraud cases. Rather, because we are addressing on the merits only the specific contentions the News makes relating to alleged instances of manifest disregard of the law as to the fraud claim, we have no occasion to consider generally the doctrine of reasonable reliance.

F. Did the Arbitrators Manifestly Disregard the Law in Deciding Teresa McLendon's Claim and Other Matters Applicable to the Fraud Award?
The remaining argument presented by the News concerning the law of fraud is, in its entirety, the following:
"The Panel also manifestly disregarded the law of Alabama in its handling of Teresa McLendon's fraud claim. Teresa McLendon did not show that The News made any promise or assurance to her when she first signed her first dealer agreement in 1999. She did not show that she relied on any such promise. *62 Even if any promises or assurances had been made to her, she did not pay any money to anyone in exchange for entering into a dealer agreement."
The arbitration panel expressly found that "Teresa was told that her contract would be automatically renewed as long as she did her job." In the statement-of-facts portion of its initial brief to this Court, the News asserted that Teresa had "no discussions with the News about the terms of a dealer agreement," citing to a page of her deposition and a page of her testimony at the hearing. In her deposition, Teresa did answer in the negative when asked if she had had any discussions with anyone from the News about paragraph 8 when she signed her agreement, but at the hearing, when counsel for the News posed the same question to her, she answered: "Well, they told me that if I did my job [the agreement] would automatically renew." Earlier in her hearing testimony, she had told her own counsel that she had understood before signing her agreement that "[a]s long as I did my job my contract would be automatically renewed" and she said that the basis for that understanding was that "[i]ts what The News told us." Obviously, the arbitration panel resolved any issue of a conflict in testimony and witness credibility in favor of Teresa McLendon. The other points made only tersely in this portion of the News's argument do not adequately articulate any manifest disregard of the law by the panel.

G. Did the Arbitrators Manifestly Disregard the Law by Awarding Double Recovery of Damages?
As set out earlier in detail, the arbitration panel awarded each plaintiff a certain amount to compensate him or her "for loss of franchise value" and a certain additional sum representing the present value of his or her "loss of future profits for 20 [or, in the case of Horn, 10] years." Also, by way of further compensatory damages, the panel awarded each plaintiff $200,000 for "mental anguish," with the exception of Horn, whom it awarded $300,000. At no point in its briefs to this Court does the News challenge the amounts awarded each plaintiff for mental damages, apart from arguing that it has no liability for damages at all.
The News argues that in awarding each plaintiff damages both for the loss of franchise value and for lost future profits the panel disregarded Alabama law prohibiting the "double recovery" of damages. Alabama law is clear that an injured party cannot receive from a single tortfeasor duplicative damages for a single wrong. As summarized by Dean Jeanelle Mims Marsh and Professor Charles W. Gamble, both of the University of Alabama School of Law, in their text Alabama Law of Damages § 1-8 (4th ed. 1999):
"There is a general rule that there can be only one satisfaction of the same damage or injury. The different means of ascertaining damages in a given situation should not be applied so as to give double damages or double compensation for the same thing."
The prohibition against double recovery underlies the equitable principle informing the law of subrogation pursuant to which a party "should not recover twice for a single injury." American Economy Ins. Co. v. Thompson, 643 So.2d 1350, 1352 (Ala.1994). The plaintiffs do not dispute that the recovery of duplicative damages would be contrary to governing Alabama legal principles; they counter only that "[t]he News errs in characterizing the awards as duplicative. Each award represents a separate and distinct injury which [the plaintiffs] suffered as a result of The News'[s] wrongful conduct." As noted earlier in this opinion, the panel "certified" *63 in its decision that it had "not allowed any duplicative recovery," and it declared at another point that "[t]he loss of future profits is a separate and distinct element of compensatory damages" from the loss of franchise value. We disagree.
The plaintiffs' expert witness, James Williams, testified both by deposition and in person at the hearing that he had, at the plaintiffs' request, made two computations of damages, which he described to plaintiffs' counsel as follows: "The first computation was the value of the franchise interest that was lost by the Plaintiffs in these newspaper dealership franchises. And then you asked me to also provide an assessment of damages for the lost earnings that could have been estimated from the franchises." Williams explained that, because each plaintiff was "a hundred percent owner" of his or her franchise and because Williams valued each "as a going concern," the calculation of the value of the franchise interest for each was the same as a calculation of the fair-market value of the franchise. In computing that market value for each franchise, Williams used, in turn, two different methods"a market approach and an income approach." One method was used to corroborate the other and they should have, and did, yield similar results. Williams testified that "[a] market approach is an approach where you are looking at transactions in the marketplace and arriving at a value based on comparables in a market," whereas "[a]n income approach is where you are determining an earning stream and dividing it by a capitalization rate or discount rate where appropriate to determine an indication of value." In forming his opinion on "the lost profits that each franchise of the plaintiffs would incur if the business was kept intact and going forward," Williams assumed a 20-year working life for each plaintiff, except for Horn, for whom he assumed a 10-year working life. He then projected profits for each year of that period, based on a variety of premises. At no time did Williams testify that an appropriate calculation of damages should, or properly could, add together the two separate damages concepts he had been asked to develop: the market value of a franchise as a going concern and the flow of profits it might generate over a 10- or 20-year period. The News cites caselaw that holds such a combination or duplication would violate the rule against the double recovery of damages.
In Albrecht v. Herald Co., 452 F.2d 124 (8th Cir.1971), the plaintiff, a contract carrier for the defendant newspaper, was forced to sell his route at a loss because of illegally competitive conduct by the newspaper. Although the plaintiff's ensuing action was brought pursuant to federal antitrust law, "[t]he damages referred to in the statute should be construed in the ordinary common law context as compensating plaintiff in full for the preventable and established loss sustained by reason of tortious or proscribed acts." 452 F.2d at 127-28. The jury had awarded the plaintiff damages both for the loss of the fair-market value of his route and for the loss of future profits. On appeal, the United States Court of Appeals for the Eighth Circuit pointed out that there was "clear proof in the record of the value of the plaintiff's business as a going concern, and that value must necessarily take into consideration its future profit-earning potential." 452 F.2d at 129.
"It is our opinion that the plaintiff has received all permissible damages ..., damages occasioned prior to the sale and the full market value on the sale of his route as a going concern.... Fair market value would be that price a willing seller could secure from a willing buyer.... Plaintiff has thus been made whole on his actual damages.... He is *64 not entitled to sell the route, receive full compensation therefor, and still receive the profits the route might have made over his reasonable work-life expectancy. The trial judge did cut these damages down to future losses occurring after the sale for a period of three years. We feel this is also is duplicitous. The prospect of future earnings is considered in arriving at the fair market value of a given business. Here undoubtedly the value of the route rested not in its tangible assets of an old truck and paper wrapper (valued $600) but in the exclusive contract for distribution of a well regarded newspaper in a given area. Whatever that fair market value might be, plaintiff has received it. Capitalizing and discounting future profits is one method of figuring present value, but this does not mean that a person is entitled to present value plus future profits."
452 F.2d at 131. See to like effect Protectors Ins. Serv., Inc. v. United States Fid. & Guar. Co., 132 F.3d 612 (10th Cir.1998); C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049 (5th Cir.1981); and Bush v. National School Studios, Inc., 131 Wis.2d 435, 443-44, 389 N.W.2d 49, 53 (Wis.Ct.App.1986). ("Lastly, National contends that the trial court erroneously permitted recovery for both lost income and lost `territory rights.' We agree. A dealer is entitled to damages resulting from the grantor's violation of the [Wisconsin Fair Dealership Law]. ... Two measures of damages are recognized: (a) lost profits, and (b) lost business value. C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1053 (5th Cir.1981). Lost future profits is an appropriate measure of damages when based on adequate data, Lehrman v. Gulf Oil Corp., 500 F.2d 659, 668 (5th Cir.1974), and proven to a reasonable probability. Esch v. Yazoo Manufacturing Co., 510 F.Supp. 53, 56 (E.D.Wis.1981). On the other hand, lost business value focuses on the reduction in value of the business. Both good will and future profits are computed into lost business value. Therefore, damages awards that include lost profits and lost business value are impermissibly duplicitous. See C.A. May Marine, 649 F.2d at 1053.")
"In a situation involving the destruction of a business, there are two basic models for proof of damages. The first requires a projection of the profits the plaintiff would have earned over some future period if it had remained in the business; these amounts are then totaled to produce the damage[s] award. The second model attempts to determine the fair market or `going concern' value of the business, i.e., what a reasonable and willing buyer would have bought it for on the date of its destruction. This figure typically is based on a projection of the average future annual earnings which the business would produce and the capitalization of that figure. Both of these methods require an analysis of prior earnings history and the projection of those earnings, if any, into the future. The two methods, however, are conceptually different; they function as mutually exclusive alternative measures. Accordingly, a plaintiff is not entitled to recover both the going concern value of a destroyed business and the profits lost after its destruction. Such a damage award would be duplicative."
Allen S. Joslyn, Measures of Damages for the Destruction of a Business, 48 Brook. L.Rev. 431-32 (1982) (footnotes omitted).
In connection with this feature of its argument, the News does not contest the legitimacy of Williams's opinions concerning the amount of "loss of franchise value" experienced by each plaintiff and the present value of the "loss of future profits" of each plaintiff, and it does not *65 assert that either would be an inappropriate method for calculating the plaintiffs' direct damages for the loss of their dealerships, if the plaintiffs were entitled to any damages at all. Rather, the News simply says that the arbitration panel should not have awarded each plaintiff both amounts because "[a]n award of both future lost profits and the lost value of each of the [plaintiffs'] businesses is plainly duplicative." We agree. By its own acknowledgment, the panel was clearly aware that awarding duplicative damages was impermissible. It is apparent, however, even accepting Williams's testimony at full face value, that by awarding each plaintiff damages "for loss of franchise value" and damages "for loss of future profits for 20 years [10 years for Horn], reduced to present day value" the panel has awarded duplicative recoveries. Therefore, the most that could be awarded by way of compensatory damages to each plaintiff is his or her mental-anguish damages and either the loss of his or her franchise value or the loss of his or her future profits, reduced to present value. Therefore, we find that the panel manifestly disregarded the law of damages in this respect. Arbitrator White recognized this, leading him to dissent from the panel's decision on the basis that "the damage[s] calculations by the majority of the Panel result in the plaintiffs' receiving duplicate damages for the same conduct."
Beyond arguing the impropriety of allowing a "double recovery" of both the loss of franchise value and the loss of future profits, however, the News makes no argument concerning which of those two recoveries should be disallowed. It does not argue that either method of calculating damages is invalid under the circumstances. It does not, for example, contend that if the plaintiffs are entitled to recover any damages at all for the loss of their dealerships, computation of the damages on the basis of "loss of future profits" would be an illegitimate approach or inferior to calculating damages based on the loss of franchise value. Indeed, in this State "the rule [is] that in the event of the destruction or interruption of an established business, loss of profits may be recovered if the amount of actual loss is rendered reasonably certain by competent proof." Hunter v. Parkman, 265 Ala. 168, 176, 90 So.2d 274, 283 (1956). "[L]ost profits are recoverable if they are proved with reasonable certainty." Johns v. A.T. Stephens Enters., Inc., 815 So.2d 511, 517 (Ala.2001). Even "anticipated profits of an unestablished business may be recovered if such damages are proved with `reasonable certainty.' Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala.1987); Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985)." Kirkland & Co. of Anniston, P.C. v. A & M Food Serv., Inc., 579 So.2d 1278, 1285 (Ala.1991). See also Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992).
Thus, we are left to determine, with no suggestion one way or the other from the News, which of the two duplicative damages components should be disallowed. Because Williams presented each to the panel as an independent and separately valid damages assessment, we have no basis in the record for preferring one over the other. Logic dictates, however, that we consider the larger award to subsume the smaller; certainly the reverse could not be true. This proposition has been stated as follows:
"It is well accepted that the fair market value of a privately held business is estimated to be the largest of the values *66 determined by the following three methods:
"(1) Income Approach: the net present value of the business's profits;
"(2) Asset Approach: the difference between the market value of its assets and liabilities; or
"(3) Market Approach: the comparable fair market value of the business as determined by either comparable publicly traded corporations or comparable companies purchased in whole. Unless the company has significant asset holdings such as real estate, securities, or natural resources, the first or third method usually generates the largest value."
George P. Roach, Correcting Uncertain Prophecies: An Analysis of Business Consequential Damages, 22 Rev. Litig. 1, 11-12 (Winter 2003) (emphasis added; footnotes omitted).
It is also logical that in undertaking to eliminate one or the other, but not both, of two duplicative elements of an arbitration award, we should do the least violence practical to the substance of the award. It is obvious that the majority of the panel considered due and owing under its findings the full measure of damages it awarded for "loss of future profits," as a fully independent damages component. Therefore, we disallow and vacate that portion of each award providing damages for the smaller separate component of "loss of franchise value."

H. Did the Arbitrators Manifestly Disregard the Law in its Award of Punitive Damages?
As a threshold proposition, the plaintiffs assert that any claim by the News that its federal constitutional due-process protections were violated by the punitive-damages awards is simply not reviewable, citing Davis v. Prudential Securities, Inc., 59 F.3d 1186 (11th Cir.1995). In that case, an individual initiated arbitration under the auspices of the American Arbitration Association against a stock brokerage firm and a stockbroker, pursuant to an underlying account agreement. He asserted tort claims and violations of state and federal securities laws. The arbitration panel awarded him both compensatory damages and punitive damages. He obtained court confirmation of the award, as provided by the account agreement, and the defendants in arbitration appealed to the United States Court of Appeals for the Eleventh Circuit. In refusing to set aside the punitive-damages award, the Eleventh Circuit held, among other things, that because the arbitration was "a private proceeding arranged by a voluntary contractual agreement of the parties," it did not constitute state action and, thus, was not subject to scrutiny under the Due Process Clause of the United States Constitution.
This holding has been criticized by legal commentators, as discussed in Knepp v. Credit Acceptance Corp. (In re: Knepp), 229 B.R. 821 (Bankr.N.D.Ala.1999), and is readily distinguishable on its facts from the situation at hand. In Davis, there was no court involvement until after the award was made. In these cases, but for the court action, there would have been no arbitration at all. These appeals are appeals from the circuit court judgments of confirmation, not from the underlying awards. Accordingly, we readily perceive the requisite state action underlying these appeals sufficient to justify our review of the awards under governing federal due-process considerations, to the extent the News has properly invoked review of those principles under its assertion that in making *67 the awards the arbitrators acted in manifest disregard of the law. (The plaintiffs reference under a "see also" introduction three cases other than Davis in connection with their assertion that review for a due-process violation is not available: Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1063-64 (9th Cir.1991), Barnes v. Logan, 122 F.3d 820 (9th Cir.1997), and Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132 (6th Cir.1996). Without discussing those cases in detail, we find their limited holdings, which in no way approach that of the Eleventh Circuit in Davis, to be clearly distinguishable, both factually and procedurally, from the present appeals.)
Because our review under the manifest-disregard-of-the-law standard must be clearly focused, we set out in full the entire of the argument the News devotes to this issue in its two briefs to this Court. In its initial brief, the News presents its challenge to the punitive-damages award as follows:
"III. The Panel's Decision Is Inconsistent, Both Internally and with the Record.
"....
"C. The Panel's Determination and Calculation of Damages Is Hopelessly and Irrationally Flawed.
"....
"(iii) The Panel's Award of Punitive Damages Is Grossly Excessive.
"By arbitrarily determining the lost value of each of the appellees' businesses, by arbitrarily determining each of the appellees' lost profits, and then by adding those two components together, the Panel compounded its error. The Panel then multiplied that erroneousindeed, fictitiousamount by 2.5 to award punitive damages. As a result, the Panel compounded its error even further, to a ridiculous extreme.
"The punitive damage awards in these cases are far out of any rational proportion to the actual compensatory damages even arguably sustained by these appellees. In Hyde's case, for example, the expert estimated the value of his business to be $160,000. Hyde had already recovered $83,000 of that amount, when he sold the single copy portion of the agreement. Thus his actual lost value, according to his own expert, would be $77,000. Hyde's damage[s] award, however, totals $2,142,280.00. The ratio of his total award to his actual damages is a multiple of roughly 26 to 1. See Georgia Power Co. v. International Brotherhood of Electrical Workers, Local 84, 995 F.2d 1030, 1032 (11th Cir.1993) (`An arbitrator's denomination of an award as compensatory will not prevent the court from determining that the award is in fact punitive'). When the duplicative and irrational aspects of each of the other so-called compensatory awards in these cases are considered, it is clear that a similar analysis applies to each of the punitive award.
"Such a multiple is irrational and in manifest disregard of the law. A grossly excessive award that is arbitrary and irrational under the guideposts set out in BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), is equally arbitrary and irrational under the FAA. Sawtelle v. Waddell [& Reed, Inc.], [304 A.D.2d 103, 754 N.Y.S.2d 264 (2003)]. It also exceeds Alabama's *68 statutory cap of three-to-one, which the Panel itself cited in its decision. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (`By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.') Cole v. Burns Int. Sec. Servs., 105 F.3d 1465, 1487 (D.C.Cir.1997)."
In its reply brief, the News argues that "the multiplier used by the Panel to award punitive damages is being applied to an arbitrary calculation of compensatory damages. As such, it runs afoul of Alabama's statutory cap on punitive damages. Ala.Code § 6-11-21."
The News then again argues in support of the applicability of the "cap" statute, the applicability of which, for the reasons hereinafter explained, we will assume without deciding. We must note, however, that § 6-11-21 applies only to actions commenced more than 60 days after its effective date of June 7, 1999; all of the complaints in these cases were filed before that time.
Lastly, the News simply notes in its reply brief:
"The News has argued that a grossly excessive award of punitive damages that is arbitrary and irrational under the due process guideposts set out in cases such as BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and most recently State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, No. 01-1289 (Supreme Court of the United States, April 7, 2003), is equally arbitrary and irrational under the standards of review of an arbitration decision."
As already explained, we decline to undertake any review based on the amorphous "arbitrary and irrational" standard. To the extent that the News argues that "such a multiple is irrational and in manifest disregard of the law," referencing the Hyde ratio it deems represents "a multiple of roughly 26 to 1," we would have reservations concerning the propriety of such a ratio. To the extent that we have eliminated the duplicative "loss of franchise value" award from the total damages allotted each plaintiff, application of the ratio between compensatory damages and punitive damages adopted by the panel requires a corresponding reduction in punitive damages. That will be easy enough to calculate, however, because the panel made this explicit finding concerning the ratio it used in determining punitive damages:
"The Panel concludes that punitive damages are due to be awarded in these cases. We also conclude that a reasonable ratio in relationship to the compensatory damages is less than the 3:1 ratio maximum generally recognized by Alabama law. We find and hold that a fair, equitable and reasonable punitive damages ratio is 2.5 to compensatory damages."
As quoted above, the News acknowledges that "the expert estimated the value of [Hyde's] business to be $160,000," and that is the value the panel awarded him for loss of franchise value, but asserts that the panel should have reduced the award by $83,000 because it reasoned Hyde had sold the single-copy portion of his branch for that amount. This argument is not presented as an instance of the arbitrators' exceeding their powers or a manifest disregard *69 of the law by the arbitrators, and no other discussion or explanation about it is provided. We are not told what, if anything "the expert," Williams, might have had to say on that subject, or whether, or how, he might have taken it into account in his computations. In short, we have no basis under the narrow review we are conducting to look behind the panel's finding of $160,000 as the loss of franchise value for Hyde.
The News does not challenge the panel's method of deriving the amount of punitive damages purely as a ratio of compensatory damages; neither does it question the propriety of a 2.5 ratio. Its only discussion of Alabama's "statutory cap" on punitive damages, as prescribed by § 6-11-21, is in relation to its argument that the 26-to-1 ratio it asserts results in Hyde's case "exceeds Alabama's statutory cap of three-to-one," and its argument that the panel's application of its 2.5 ratio "to an arbitrary calculation of compensatory damages ... runs afoul" of the statutory cap.
Apart from its discussion of the proportionality of the ratio perceived by the News to have been used in Hyde's case (and its general reference to "the duplicative and irrational aspects of each of the other so-called compensatory awards in these cases"), the News presents no argument to the effect that the panel manifestly disregarded controlling legal principles relating to its assessment of punitive damages. We note that the panel presented an extensive explanation of the numerous factors and criteria it considered in arriving at its assessment of punitive damages, over the course of paragraphs 250-273 of its decision, and it certainly cannot be said that it completely ignored or disregarded the legal principles laid down in BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), as opposed to any argument, which would be unavailing under a manifest-disregard-of-the-law review, that the panel misunderstood or misapplied those legal principles. All in all, we find no instance where the News has successfully identified a manifest disregard by the panel of the law of punitive damages.

V. Conclusion
We affirm the compensatory damages awarded under the fraud claim, adjusting that award to eliminate a "double recovery" and we affirm the punitive damages awarded under the fraud claim, with a corresponding adjustment occasioned by the application of 2.5 ratio to a lesser amount of compensatory damages. In that regard, we affirm in part and reverse in part and we render a judgment, rather than remanding the case for the circuit court to remand it to the panel, because all of the adjustments our opinion requires to the damages awards implicate only the application of basic mathematics. In each instance, we eliminate the compensatory damages component of "loss of franchise value"; we then subject the sum of the remaining compensatory damages components of "loss of future profits" and mental anguish to a multiplier of 2.5 to arrive at the punitive-damages award. We do not do so because that is a proper way to determine punitive damages in the ordinary case, but only because that approach survives intact from the panel's decision after all of the issues raised by the News have been disposed of. Accordingly, we hereby enter judgments against the News and in favor of the respective plaintiffs as follows:

*70
 Jesse Glass
 $ 848,603.00 for loss of future profits
 + 200,000.00 for mental anguish
 ____________
 $1,048,603.00 total compensatory damages
 × 2.5
 ____________
 $2,621,507.50 punitive damages
 +1,048,603.00 compensatory damages
 ____________
 $3,670,110.50 total damages
 James and Teresa McLendon
 $ 975,955.00 for loss of future profits
 200,000.00 for mental anguish for James
 + 200,000.00 for mental anguish for Teresa
 ____________
 $1,375,955.00 total compensatory damages
 × 2.5
 ____________
 $3,439,887.50 punitive damages
 +1,375,955.00 compensatory damages
 ____________
 $4,815,842.50 total damages
 Sherry Horn
 $ 305,170.00 for loss of future profits
 + 300,000.00 for mental anguish
 ____________
 $ 605,170.00 total compensatory damages
 × 2.5
 ____________
 $1,512,925.00 punitive damages
 + 605,170.00 compensatory damages
 ____________
 $2,118,095.00 total damages
 Hugh Stewart
 $ 533,580.00 for loss of future profits
 + 200,000.00 for mental anguish
 ____________
 $ 733,580.00 total compensatory damages
 × 2.5
 ____________
 $1,833,950.00 punitive damages
 + 33,580.00 compensatory damages
 ____________
 $2,567,530.00 total damages
 Kameron Hyde
 $ 496,912.00 for loss of future profits
 + 200,000.00 for mental anguish
 ____________
 $ 696,912.00 total compensatory damages
 × 2.5
 ____________
 $1,742,280.00 punitive damages
 + 696,912.00 compensatory damages
 ____________
 $2,439,192.00 total damages

MOTION TO DISMISS APPEAL DENIED; AFFIRMED IN PART; REVERSED IN PART; AND JUDGMENTS RENDERED.
HOUSTON, BROWN, and STUART, JJ., concur.
SEE and LYONS, JJ., concur specially.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
WOODALL, J., recuses himself.
SEE, Justice (concurring specially).
I concur with the main opinion's holding affirming in part and reversing in part the arbitrators' awards, and rendering judgments for the plaintiffs. I also concur with Justice Lyons's special concurrence. I write specially, however, to note my concern regarding the calculation of damages.
I agree with the majority's holding that the arbitration panel impermissibly allowed the plaintiffs a double recovery in awarding damages based both on the loss of franchise value and on the loss of future profits. However, as the majority opinion notes, neither the News nor the dealers present any argument as to which of the duplicative damages awards should be disallowed. Therefore, "[b]ecause [the plaintiffs' expert] presented each [award] to the panel as an independent and separately valid damages assessment, we have no basis in the record for preferring one over the other." 901 So.2d at 65.
Considering this absence of evidence and argument, the majority concludes that "[l]ogic dictates ... that we consider the larger award [which is based on the projected future income stream] to subsume the smaller [which is based on the loss of franchise value]," 901 So.2d at 65, and, for that reason, the majority disallows the smaller award. In the absence of evidence and argument, that conclusion is not unreasonable.
*71 In support of its conclusion, however, the majority cites the following:
"`It is well accepted that the fair market value of a privately held business is estimated to be the largest of the values determined by the following three methods:
"`(1) Income Approach: the net present value of the business's profits;
"`(2) Asset Approach: the difference between the market value of its assets and liabilities; or
"`(3) Market Approach: the comparable fair market value of the business as determined by either comparable publicly traded corporations or comparable companies purchased in whole. Unless the company has significant asset holdings such as real estate, securities, or natural resources, the first or third method usually generates the largest value.'"
901 So.2d at 65-66, quoting George P. Roach, Correcting Uncertain Prophecies: An Analysis of Business Consequential Damages, 22 Rev. Litig. 1, 11-12 (Winter 2003) (footnotes omitted). Roach maintains that it is "well accepted" that the fair-market value of a business is "the largest" of the values determined by the income, asset, and market approaches, but he provides no authority for that statement. The footnote corresponding to that assertion directs the reader to In re Marriage of Cutler, 334 Ill.App.3d 731, 778 N.E.2d 762, 268 Ill.Dec. 496 (2002); however, nowhere in Cutler is there support for the proposition that it is "well accepted" that the largest of the values calculated using one of the three methods identified by Roach is the proper measure of the fair-market value of a business. Cutler merely identifies the three different methods, and, in fact, the Cutler court ultimately remanded the case with instructions for the trial court to use the smaller of the two valuation figures before it. Moreover, the notion that the largest of three independent estimatesall three of which would be expected in a perfect world to render the same valuewould by some fortuity be the correct one challenges logic, reason, experience, and intuition.
Nonetheless, notwithstanding the lack of support for the proposition advanced by the excerpt from the Roach article, in this case I must concur with the majority's award of damages based on the loss of future profits. I do so, however, only because I have been offered no evidence or argument that will permit me to dissent from it.[10]
LYONS, Justice (concurring specially).
I concur in the main opinion, including that aspect of the main opinion rejecting the plaintiffs' argument that the News's appeal is due to be dismissed because the News failed to file a notice of appeal after the clerk of the circuit court entered the arbitrators' awards as judgments of the circuit court. I write specially to deal with the proper method for seeking review of an award entered in an arbitration conducted *72 pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("the FAA").
Section 6-6-15, Ala.Code 1975, provides as follows:
"Either party may appeal from an award under this division. Notice of the appeal to the appropriate appellate court shall be filed within 10 days after receipt of notice of the award and shall be filed with the clerk or register of the circuit court where the action is pending or, if no action is pending, then in the office of the clerk or register of the circuit court of the county where the award is made. The notice of appeal, together with a copy of the award, signed by the arbitrators or a majority of them, shall be delivered with the file of papers or with the submission, as the case may be, to the court to which the award is returnable; and the clerk or register shall enter the award as the judgement [sic] of the court. Thereafter, unless within 10 days the court shall set aside the award for one or more of the causes specified in Section 6-6-14, the judgment shall become final and an appeal shall lie as in other cases. In the event the award shall be set aside, such action shall be a final judgement [sic] from which an appeal shall lie as in other cases."
The main opinion properly rejects the view of a concurring judge in Sanderson Group, Inc. v. Smith, 809 So.2d 823, 832 (Ala.Civ.App.2001) (Murdock, J., concurring specially), that Rule 4(a)(1), Ala. R.App. P., requires that the time for taking an appeal from an arbitration award must run from the date of the entry of a final judgment by the circuit court based on the arbitrator's award, rather than from the date of receipt of the arbitrator's award as provided in § 6-6-15. The main opinion points out that § 6-6-15 is not among the statutes superseded when the Alabama Rules of Appellate Procedure were promulgated and further notes that this Court has reviewed an award pursuant to § 6-6-15 without requiring an additional notice of appeal after the final judgment had been entered on the arbitrator's award. See H.L. Fuller Constr. Co. v. Industrial Dev. Bd. of Town of Vincent, 590 So.2d 218, 221 (Ala.1991), and Pruett v. Williams, 623 So.2d 1115 (Ala.1993).
In Ex parte Stewart, 786 So.2d 464 (Ala.2000), the News successfully persuaded this Court, over my dissenting opinion, that the FAA applied to the transactions now made the basis of the arbitrators' award. Because § 6-6-15, not Rule 4(a)(1), controls on the question whether a notice of appeal is necessary after entry of a judgment on the arbitration award, one might question whether the News is judicially estopped from relying on § 6-6-15, which is limited to an award "under this division." The reference to "this division" encompasses arbitration proceedings conducted pursuant to Title 6, Chapter 6, and can also be read to encompass "arbitration at common law." See § 6-6-16. However, an arbitration under the FAA is neither an arbitration pursuant to Title 6, Chapter 6, nor an arbitration at common law. Yet, if we construe the right of appeal conferred by § 6-6-15 to be inapplicable to an arbitration conducted pursuant to the FAA, we would run afoul of settled principles governing the applicability of the FAA.
A right of appeal is a matter of legislative grace. See Flannigan v. Jordan, 871 So.2d 767, 769-70 (Ala.2003), in which this Court observed as follows:
"An appeal is not a vested right but rests on statutory grounds. Greystone Close v. Fidelity & Guar. Ins. Co., 664 So.2d 900, 902 (Ala.1995); Echols v. Star Loan Co., 290 Ala. 76, 79, 274 So.2d 51, 53 (1973), citing Stone v. Lewin, 8 Ala. *73 395 (1845); Burgess v. State Dep't of Indus. Relations, 637 So.2d 1366, 1368 (Ala.Civ.App.1994) (`It is well settled that an appeal is not a matter of vested right but is by the grace of statute and must be perfected pursuant to the time and manner prescribed in the controlling statute.')."
Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), holds that Congress intended the FAA to apply in state courts and to preempt state antiarbitration laws to the contrary. 465 U.S. at 16, 104 S.Ct. 852.
Title 9 U.S.C. § 10 provides:
"§ 10. [Award of arbitrators]; vacation; grounds; rehearing
"(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
"(1) where the award was procured by corruption, fraud, or undue means;
"(2) where there was evident partiality or corruption in the arbitrators, or either of them;
"(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
"(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."
(Emphasis added.) However, § 10 of the FAA does not confer subject-matter jurisdiction upon a federal district court to entertain a proceeding to vacate an arbitration award. See Perpetual Sec., Inc. v. Tang, 290 F.3d 132, 136 (2d Cir.2002), in which the United States Court of Appeals for the Second Circuit held as follows:
"Section 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10, allowing federal district courts to vacate arbitration awards, does not confer upon federal district courts subject matter jurisdiction. United States v. Am. Soc. of Composers, Authors & Publishers, 32 F.3d 727, 731 (2d Cir.1994); Harry Hoffman Printing v. Graphic Communications, Int'l Union, Local 261, 912 F.2d 608, 611 (2d Cir.1990); see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (`The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction.'). `There must be an independent basis of jurisdiction before a district court may entertain petitions under the Act.' Harry Hoffman Printing, 912 F.2d at 611."
If we were to decline to permit reliance on § 6-6-15 in instances where the FAA applies, not only would we have created a horrendous trap for the unwary, we would also risk defiance of United States Supreme Court precedent condemning state statutes that discriminate against arbitration. See Southland Corp., supra. See also Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), holding that the FAA precludes a state from singling out arbitration provisions for suspect status. By allowing an appeal of an FAA arbitration pursuant to § 6-6-15, a statute relegated under Alabama law to post-dispute agreements to arbitrate, we avoid the charge of affording *74 parties to an arbitration under Alabama law greater right to relief from an award than we make available to parties to an arbitration under the FAA. We should do so by simply holding the limitation "under this division" that appears in § 6-6-15 to be constitutionally impermissible with respect to an FAA arbitration.
We do not reach the separate question whether a party to an FAA arbitration who has no independent basis for federal jurisdiction has a remedy by independent action in the circuit court. Other jurisdictions have persuasively construed the limitation-of-forum provisions in the FAA to deal only with venue; they therefore do not constitute a grant of exclusive jurisdiction to federal courts. See Moss v. Prudential-Bache Sec., Inc., 581 A.2d 1138, 1140 (Del.1990), in which the Supreme Court of Delaware stated:
"Section Nine of the Act is merely a venue statute and was never intended to create exclusive federal question subject matter jurisdiction in the federal courts. See Southland Corp. v. Keating, 465 U.S. 1, 16 n. 9, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984) (Act `does not create any independent federal question jurisdiction under 28 U.S.C. § 1331 or otherwise'); Moses H. Cone Memorial Hospital v. Mercury Const[r]. Corp., 460 U.S. 1, 25 & n. 32, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983) (`federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state courts' and the Act does not create `independent federal-question jurisdiction'); see, e.g., Motion Picture Laboratory Technicians Local 780 v. McGregor & Werner, Inc., 804 F.2d 16, 18-19 (2d Cir.1986). The Court of Chancery therefore shares concurrent subject matter jurisdiction with the federal district courts in cases arising under the Act regardless of whether the employment agreement was valid in this case. See Moses H. Cone Memorial Hospital, 460 U.S. at 25, 103 S.Ct. at 941."
See also Bunge Corp. v. Perryville Feed & Produce, Inc., 685 S.W.2d 837, 839-40 (Mo.1985) ("Defendant's counsel argued that the federal statute cannot be applied to a proceeding in the Missouri courts. This clearly is not so. An action under the Federal Arbitration Act may be brought in a state court. State ex rel. St. Joseph Light and Power Co. v. Donelson, [631 S.W.2d 887 (Mo.Ct.App.1982)]. The court under the supremacy clause is obliged to apply federal law, and may not apply state law, substantive or procedural, which is in derogation of federal law. Moses H. Cone Memorial Hosp. v. Mercury Const[r]. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).").
I commend to the attention of the Advisory Committee on the Rules of Appellate Procedure the wisdom of submitting a proposal to this Court for revising the Rules of Appellate Procedure (a) to establish an easily understood triggering date for the time for taking an appeal from an arbitrator's award and, should the proposed revision conflict with § 6-6-15, to recommend the abrogation of § 6-6-15, and (b) to recognize the availability of an independent action in the circuit court from which an appeal would lie as in other cases.
SEE, J., concurs.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the judgment).
But for the several reservations specified and explained below, I concur fully in all of the holdings in the scholarly main opinion. None of my reservations detracts from my vote in favor of the judgment of this Court. I will explain my reservations.
First, the main opinion states:

*75 "Beginning with the Code of Alabama of 1923, the Alabama Code has included a statutory prohibition (now codified as § 8-1-41(3)) against the specific enforcement of a predispute agreement to submit a controversy to arbitration. However, through the combined holdings of several decisions of the United States Supreme Court, the application of that prohibition has been relegated to the rare case of a purely intrastate transaction that could not be said to `involve commerce' in any way. See Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); and Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003)."
901 So.2d at 44. I do not agree that transactions which do not meet the interstate commerce criterion, 9 U.S.C. § 2, for the applicability of the Federal Arbitration Act are necessarily rare as a result of the cited cases or any others from the United States Supreme Court. See Service Corp. Int'l v. Fulmer, 883 So.2d 621, 637-38 (Ala.2003) (Johnstone, J., concurring in the rationale in part and concurring in the judgment); Bowen v. Security Pest Control, Inc., 879 So.2d 1139, 1143-44 (Ala.2003) (Johnstone, J., dissenting); and Cook's Pest Control, Inc. v. Hastings, 883 So.2d 1207, 1207 (Ala.2003) (Johnstone, J., concurring in the result). I am concerned that such transactions will become rarer than Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003), requires because of gratuitous expansions of Citizens by this Court. See Fulmer, supra (Johnstone, J., concurring in the rationale in part and concurring in the judgment); Bowen, supra (Johnstone, J., dissenting); and Hastings, supra (Johnstone, J., concurring in the result). However, because the material I have quoted from the main opinion is just part of a historical discussion rather than a holding on an issue before us in this case, my disagreement does not affect our holdings or judgment.
My second reservation is that I question the holding in the main opinion that the punitive-damage awards in this case constitute State action subject to review for violation of the Due Process Clause of the United States Constitution. I do not agree that the case before us is materially distinguishable from Davis v. Prudential Securities, Inc., 59 F.3d 1186 (11th Cir.1995), which rejected the assertion by Prudential Securities, Inc. ("PSI"), that arbitrators' punitive-damage awards are subject to judicial review for compliance with the Due Process Clause. Davis held:
"[C]onstitutional due process protections `do not extend to "private conduct abridging individual rights."' ... Thus, only state action is subject to scrutiny under the Due Process Clause....
"... [W]e agree with the numerous courts that have held that the state action element of a due process claim is absent in private arbitration cases.... In the present case, the arbitration was a private proceeding arranged by a voluntary contractual agreement of the parties. Accordingly, the arbitration proceeding itself did not constitute state action.
"....
"... [T]he mere confirmation of a private arbitration award by a district court is insufficient state action to trigger the application of the Due Process Clause.
"....
"In sum, we are persuaded that PSI's due process challenge to the arbitration panel's award of punitive damages must fail. To decide otherwise would constitutionalize *76 private arbitration proceedings and diminish both the effectiveness and the appeal of the arbitral forum as an alternative means for resolving disputes. See Rifkind & Sterling, [Inc. v. Rifkind, 28 Cal.App.4th 1282,] 33 Cal.Rptr.2d [828] at 834 [(1994)] (warning that if the same due process incidents imposed on jury awards were required in arbitration, `the contrasting simplicity, informality, and private nature of arbitration would be seriously undermined'). We therefore affirm the district court's confirmation of the punitive damage award."
59 F.3d at 1190-94.
Section 6-6-15, Ala.Code 1975, which the News invoked to appeal this case to us, expressly provides for two tiers of judicial review. For the first tier, the circuit court reviews the private award, just like the federal district court did in Davis. For the second tier, the appellate court (this Court in this particular case) reviews the judgment of the circuit court, just like the federal appeals court reviewed the judgment of the federal district court in Davis. In each casethis one and Davisno due process issue was before the trial court because it was reviewing only the private action of one or more arbitrators; and no due process issue was or is before the appellate court because it cannot review an issue that was not validly presented to the trial court. Ex parte Weaver, 871 So.2d 820, 823 (Ala.2003) ("`Our review is limited to the issues that were before the trial courtan issue raised on appeal must have first been presented to and ruled on by the trial court.' Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala.1992).").
I am in a dilemma in voting on this issue. On the one hand, for the reasons I have explained, I think we should not be reviewing these punitive-damage awards for compliance with the Due Process Clause at all. On the other hand, the judgment and the punitive-damage holdings of the main opinion achieve considerable justice, and they may need my vote to achieve a majority. Consequently, I concur in the result of the holding of the main opinion subjecting the punitive-damage awards to due-process review in this particular case.
My third and last reservation is that I question the implicit holding in the main opinion that the multiplier of 2.5 applied by the arbitrators to their compensatory awards to compute their punitive-damage awards is necessarily a sufficient multiplier to apply to the lower compensatory damages we are approving to compute the punitive damages we are approving. A lower compensatory award could militate in favor of a higher multiplier in the case of particularly egregious conduct, like the conduct of the News in this case. However, because I think the main opinion achieves considerable justice in applying the 2.5 multiplier and may need my vote to achieve a majority, I concur in the result of applying the 2.5 multiplier.

On Application for Rehearing
HARWOOD, Justice.
The Birmingham News Company ("the News") has applied for a rehearing of our decision issued on June 11, 2004, in these consolidated appeals. We deny the application, but we address the News's earnest insistence that in our original opinion we erred in numerous respects.
Rule 40, Ala. R.App. P., governs applications for rehearing. Rule 40(b), Ala. R.App. P., provides:
"(b) Content of the Application and the Brief in Support. The application for rehearing must state with particularity the points of law or the facts the applicant believes the court overlooked or misapprehended. The brief in support *77 of the application must contain any arguments in support of the application the petitioner desires to present."
The News's application for rehearing lists 16 separate "points of law or fact" that the News asserts this Court overlooked or misapprehended in our June 11 opinion, "all of which [it says] were addressed in the briefs previously submitted to the Court by the News."
The News's subsequently filed brief in support of its application for rehearing begins with the following statement:
"In its opinion of June 11, 2004, the Court overlooked or misapprehended significant points of fact or law in at least four areas: (i) in its selection of lost future profits rather than fair market value as the appropriate measure of economic damages in these cases and, in making that selection, in failing to reduce such lost future profits by each plaintiff's post-dealership earnings; (ii) in affirming the arbitration panel's finding of promissory fraud; (iii) in upholding the panel's refusal to be governed by the terms of the arbitration agreement between the parties and, specifically, the limitation of damages provision contained therein; and (iv) in failing to adopt standards of review under the Federal Arbitration Act (`FAA') described by The News in its previous briefs to the Court."
The News then presents its arguments under four sections headed by the Roman numerals I, III, IV, and V.[1] The first section is subdivided into parts "A" and "B." To the extent any of the 16 points of law or fact listed in the application are not reiterated and adequately argued in the "rearranged" format of the brief, they are deemed waived. See Rule 28(a)(6) and (10), Rule 32, and Rule 40(g), Ala. R.App. P. Furthermore:
"Matters not argued in an appellant's brief on original submission cannot be raised for the first time on application for rehearing. As this Court recently recapitulated this rule:
"`[Respondent] raises [this argument] for the first time in its application for rehearing.... "We can not sanction the practice of bringing up new questions for the first time, in an ex parte application for rehearing." Robinson v. Allison, 97 Ala. 596, 604, 12 So. 604 (1893) (on application for rehearing). "We cannot sanction the practice of bringing up new questions for the first time in application for rehearing." Kirkland v. Kirkland, 281 Ala. 42, 49, 198 So.2d 771, 777 (1967) (on application for rehearing). "We cannot sanction the practice of bringing up new questions for the first time in applications for rehearing." Cole v. Cole Tomato Sales, Inc., 293 Ala. 731, 735, 310 So.2d 210, 212 (1975) (on application for rehearing). "New supporting arguments presented for the first time on rehearing generally will not be considered." Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251, 253 (Ala.1985) (on application for rehearing). "[T]his argument was raised for the first time on application for rehearing, and therefore will not be considered." Schulte v. Smith, 708 So.2d 138, 141 n. 2 (Ala.1997) (on application for rehearing).'
"Ex parte Lovejoy, 790 So.2d 933, 938-39 (Ala.2000)."
SouthTrust Bank v. Copeland One, L.L.C., 886 So.2d 38, 43-44 (Ala.2003) (opinion on rehearing).
*78 Additionally, the first sentence of Rule 28(a)(10), Ala. R.App. P., requires that an appellant's brief include "[a]n argument containing the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."
"Where an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court's duty nor its function to perform all the legal research for an appellant."
Sea Calm Shipping Co. v. Cooks, 565 So.2d 212, 216 (Ala.1990). With these well-established principles of appellate procedure to guide us, we address each argument the News presents in its brief on rehearing, quoting by way of introduction for each the "heading" used by the News in its brief and assigning the Roman numeral used in the News's brief for the section:

"I. The Court Overlooked or Misapprehended Significant Points of Law and Fact in Its Selection of Lost Future Profits as the Appropriate Measure of Damages in These Cases.

"A. The Proper Measure of Damages Is Fair Market Value."
In the text associated with this argument, the News only once cites its briefs on original submission, and it cites pages 106-08 of its initial brief. Those pages were included in the section of that brief captioned "III. The Panel's Decision is Arbitrary, Capricious, and Irrational." We declined to entertain the ground that the panel's decision was "arbitrary, capricious, and irrational," explaining in detail why we rejected it. 901 So.2d at 52-54. Section II of that brief was headed "II. The Panel's Decision Should Be Vacated Because The Panel Manifestly Disregarded Alabama Law." For the reason we explained in our opinion, we entertained and applied the "manifest disregard of the law" ground of review. All that the News actually argued at pages 106-08 of its initial brief was the proposition that "[a]n award of both future lost profits and the lost value of each of the appellees' businesses is plainly duplicative." It is true that, after citing Albrecht v. Herald Co., 452 F.2d 124 (8th Cir.1971), in support of that argument, the News quoted from Albrecht the statement, quoting in turn Simpson v. Union Oil Co. of Cal., 411 F.2d 897 (9th Cir.1969), that the "proper measure of damage was the market value of the business"; that quote, however, was not submitted in the context of an argument that market value was the only or the preferred approach to measuring damages. Rather, as the News summed up in the last two paragraphs of that segment of its argument, the statement from Albrecht (quoting Simpson) was offered only in support of the argument that "to award both lost value and lost profits would be duplicative." We agreed with the News on that point, it having been adequately cast in the News's initial brief as an instance where "Alabama law prohibiting double recovery [being] clear and long standing," the panel "disregarded the law" in awarding duplicative damages. We pointed out, however:
"Beyond arguing the impropriety of allowing a `double recovery' of both the loss of franchise value and the loss of future profits, however, the News makes no argument concerning which of those two recoveries should be disallowed. It does not argue that either method of calculating damages is invalid under the circumstances."
901 So.2d at 65. We explained why, under the circumstances, we felt obliged to allow the "loss of future profits" measure of damages to survive the elimination process, rather than the "loss of franchise *79 [i.e., market] value" approach. 901 So.2d at 62-66.
The News now argues for the first time that we should have chosen the fair-market-value approach on the basis of the "intent of the panel," which it says we should have discerned from the fact that the dissenting arbitrator "selected fair-market value as the appropriate measure of damages," thus making that measure of damages the only one "agreed by all three arbitrators to be a proper component of damages." Because this argument was never presented on original submission, we will not consider it on rehearing.

"B. If the Court maintains Its Selection of Lost Future Profits, Rather Than Fair Market Value, It Should at a Minimum Correct the Award."
The introductory sentence of this section of the News's rehearing brief states: "In its briefs to the Court, The News described fundamental errors with the panel's award of lost future profitserrors that amount to manifest disregard of the law." (Emphasis supplied.) Although the News now says that the panel's alleged errors "amount to" manifest disregard of the law, it never made that argument on original submission. We come to that conclusion only after examining and considering each citation the News makes in this section of its rehearing brief to its briefs on original submission.
The first reference, to pages 69-70 of the News's original brief, relates only to a "bullet point" statement that is not a part of any argument, but is included in the "statement of facts" section of the original brief. Accordingly, the statement would have operative effect as an argument advanced in the brief only to the extent that it was properly brought forward to the argument section.
The next of the News's citations, to page 74 of its original brief, is included as a part of the introductory "summary of argument" where the News asserted:
"The most dramatic examples of the arbitrary and irrational nature of this decision are the Panel's awards of damages. The Panel awarded the appellees double recovery, contrary to Alabama law and policy prohibiting double recovery, and the Panel awarded damages exceeding those actually sustained by each of the appellees."
Even disregarding the fact that this statement represents only a summary of the argument to come, the ground that the award was "arbitrary and irrational" is the only ground referenced, and the only "argument" offered, aside from the "double recovery" issue, is the sparse assertion that "the Panel awarded damages exceeding those actually sustained by each of the appellees."
The next citation in the rehearing brief, to pages 110-11 of the original brief, does direct us to a subsection of the original brief captioned "Lost Profits," containing the statement that, to the extent any award of lost profits was proper, "the Panel should have deducted from that award the amount each plaintiff is currently earning in another occupation." That section of the original brief consisted of only six sentences, however, with no citations to the record or case authority, and, most importantly, as was the case earlier, was a part of the section of the brief asserting that the panel's decision was "[a]rbitrary, [c]apricious, and [i]rrational." The News did not make this "deduction" argument in its separate argument section arguing the ground of manifest disregard of the law.
Finally, with respect to the citation in the rehearing brief to pages 46-49 of the News's reply brief on original submission, those pages are a part of the subsection captioned "The Panel's Decision *80 is Arbitrary, Capricious, and Irrational." A separate section of the reply brief addressed the ground of manifest disregard of the law. Furthermore, the discussion at pages 46-49 is introduced by the statement, at the bottom of page 45, that "no better example of the arbitrary, capricious, and irrational nature of the decision exists than in the award of damages." Granted, there is the statement at pages 48-49 of the reply brief that "[h]ow such an award is anything other than in manifest disregard of the law, arbitrary, capricious, and irrational is beyond explanation." However, application of the term "in manifest disregard of the law" to this issue was not further explained, and the concept of manifest disregard of the law was not referenced in any way when this issue was discussed in the News's brief on original submission. "[I]t is well-settled that [an appellant] may not raise an issue for the first time in a reply brief filed on appeal." Giambrone v. Douglas, 874 So.2d 1046, 1057 (Ala.2003). Furthermore, nowhere in this entire segment of the reply brief (pp. 46-49) is there a citation to any case or to any other "law" the panel supposedly "disregarded."
The News's next citation to either of its original briefs in section "I-B" of its brief on rehearing appears at page 7 and page 8, where the News twice refers to page 62 of the original brief. That page of the original brief formed a part of the lengthy statement of the case and would be pertinent only to the extent that it was brought forward as part of any of the arguments. Next, the News references in its rehearing brief page 64 of its original brief which, again, represents only a continuation of the extended statement of facts.
In light of the foregoing review of all of references the News now makes to its original briefs, we simply cannot agree with its assertion on page 8 of its rehearing brief that "[t]hroughout this proceeding and this appeal, the News has maintained that such an award [of lost future profits] is in manifest disregard of the law." Rather, the News attacked the propriety of the award of lost future profits only on the completely separate and distinct ground that it was "arbitrary, capricious, and irrational," a ground we declined to entertain. At pages 9-10 of its brief on rehearing, the News asserts:
"In its briefs to this Court, The News again argued that an award of lost future profits in the manner calculated by the panel is inappropriate. (See, e.g., Brief, p. 110-111; Reply Brief, p. 48-50.) The News not only cited authority to the effect that the proper measure of damages in cases such as these is fair market value, not lost future profits, but that, in any event, an award of lost future profits that fails to take into account a plaintiff's current earnings is inappropriate. See Albrecht v. Herald Co., 452 F.2d 124 (8th Cir.1971); Simpson v. Union Oil Co. of Cal., 411 F.2d 897 (9th Cir.1969), rev'd on other grounds, 396 U.S. 13 (1969)....
"Another case along the same lines is Lehrman v. Gulf Oil Corp., 500 F.2d 659 (5th Cir.1974), which this Court cited in its opinion."
As noted, however, on original submission the News discussed Albrecht, including its quote from Simpson, only in furtherance of its argument that double recovery should not be allowed, without any discussion of which method of calculating damages should be preferred. Lehrman v. Gulf Oil Corp., 500 F.2d 659 (5th Cir.1974), which the News did not cite originally, was cited in our June 11 opinion simply for the proposition that lost future profits could be *81 "an appropriate measure of damages when based on adequate data." 901 So.2d at 64.
The News argued originally only that the award of lost future profits was arbitrary, capricious, and irrational; it did not attempt, as it now does, to relate those contentions to the ground of "manifest disregard of the law," and it never argued selectively as between the two methods of calculating damages.

"III. The Court Overlooked or Misapprehended Significant Points of Law and Fact in Its Decision To Uphold the Panel's Finding of Promissory Fraud."

In this section of its rehearing brief (consisting of only two sentences), the News asserts that it pointed out in its original briefs that the panel's finding of promissory fraud "notwithstanding the absence of evidence of the essential elements of a present intent to deceive and intent not to perform constitutes a manifest disregard of the law." (Emphasis supplied.) Again, we must analyze the specific citations the News makes to its original briefs to determine the nature of the arguments it advanced at that time. The News cites to pages 67, 73, and 89-90 of its initial brief and to pages 38-39 and 50 of its reply brief. Taking those up in order, we find that at page 67 of its initial brief, the News simply included a "bullet point" as a part of its statement of the facts, charging that "[n]owhere ... is there any evidence of a present intent to deceive any of these particular dealers." The only pertinent statement on page 73 of the original brief (included in the "summary of the argument" section) is that the panel "knew that a present intent to deceive is an element of a claim of promissory fraud." Pages 89-90 are part of the argument section of the original brief relating to the contention that the panel disregarded the law of fraud, and we quoted in its entirety the argument the News made on those pages concerning the alleged absence of proof of present intent. See 901 So.2d at 59-60. We stand by the analysis we then undertook. 901 So.2d at 60-61.
The News does not explain in its rehearing brief how our analysis on the issue was flawed, other than to claim that there was an "absence of evidence" of the requisite of intent. Its present citation to pages 38-39 of its reply brief directs us to a portion of that brief that did not address that issue, but addressed the more basic issue whether the panel had erred in concluding that the fraud in question was not promissory fraud. We agreed with the News that the essential nature of the fraud was that of promissory fraud, and we then analyzed the elements accordingly. Finally, at page 50 of its reply brief, the News simply again asserted that there was no evidence from which the panel could have, in effect, found evidence of a present intent to deceive and not to perform. Therefore, we respectfully disagree with the News's argument that we overlooked or misapprehended, as to the subject of this section of the rehearing brief, any points which the News chose to present in its original briefs.

"IV. The Court Overlooked or Misapprehended Significant Points of Law and Fact in Upholding the Panel's Refusal to be Governed by the Terms of the Arbitration Agreement."

As the News implicitly acknowledges by its citation to pages 81-82 of its original brief (its only citation to its original brief), the News argued this issue in its original brief on the theory that the panel had exceeded its authority by disregarding what the News characterized as a limitation-on-damages clause. We fully addressed this issue in our June 11 opinion, 901 So.2d at 55-56, but the News takes no *82 note in the paragraph of text it devotes to the issue in its brief on rehearing of our analysis, and it offers no argument in opposition to the rationale we presented in our June 11 opinion. Accordingly, there is nothing for us to reconsider.

"V. The Court Overlooked or Misapprehended Significant Points of Law and Fact in Declining to Adopt Standards of Review Recognized Under the [Federal Arbitration Act]."

The final issue the News argues in its rehearing brief is simply that this Court should have recognized and adopted as appropriate additional, alternative standards of review for the vacatur of awards in arbitration cases the ground that an award is "irrational and arbitrary" (omitting the companion adjective "capricious" consistently used in this formulation in the original briefs) or that it "fails to derive its essence" from the underlying contract. As noted, we discussed in detail in our June 11 opinion why we believed our recognition of the ground of vacatur that the arbitrators "exceeded their powers" or that they acted in "manifest disregard of the law," provided a scope of review appropriate to the aims and purposes of arbitration and why we consequently declined to adopt the other grounds the News proposed. On application for rehearing, the News states that "[t]he U.S. Court of Appeals for the Eleventh Circuit recognizes [the ground that an award is `irrational' or `arbitrary,' and the ground that an award `fails to derive its essence' from the underlying contract]. See Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456, 1461-62 (11th Cir.1997)." Although the pages of Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456 (11th Cir.1997), cited by the News contain no reference to the "arbitrary and capricious" ground other than to note an earlier decision in which that court "held an arbitration award not to be arbitrary and capricious," we judicially know, and other portions of the Montes opinion confirm, that the United States Court of Appeals for the Eleventh Circuit recognizes as a nonstatutory reason for vacating an arbitration award that the award is "arbitrary or capricious." Montes, 128 F.3d at 1458, 1459 n. 5. The appellant in Montes did not raise that ground, however, and the Montes opinion does not discuss or apply it. Rather, as we pointed out in our discussions of Montes in our June 11 opinion, that decision is noteworthy because in it the Eleventh Circuit Court of Appeals finally adopted the ground of "manifest disregard of the law." 901 So.2d at 48-49, 50-51. The Montes opinion contains no reference to the other ground the News now says the Eleventh Circuit recognized in it for vacating an arbitration award, i.e., that the award fails to derive its essence from the underlying contract.
The News also contends that this Court previously recognized the grounds of "irrational and arbitrary" and "fails to derive its essence" in H.L. Fuller Construction Co. v. Industrial Development Board of Vincent, 590 So.2d 218 (Ala.1991). In its application for rehearing, the News asserts that in Fuller, "this court proceeded to determine whether an arbitration award was `inconsistent on its face,' lacked `fundamental rationality,' and was so `imperfectly executed' that it violated the [Federal Arbitration Act]." This contention is not revisited in the supporting brief. At any rate, it represents a serious misreading of Fuller. The terms the News quotes and states indicate our recognition of them in Fuller appear only in a preliminary statement in the opinion in which we explained that the appellant "argues that the award is inconsistent on its face, that it lacks fundamental rationality, and that it is so `imperfectly executed' that it violated the [Federal Arbitration Act] and should not be allowed to stand." 590 So.2d at 221 *83 (emphasis supplied). When the Court addressed Fuller's grounds for a determination, however, it addressed from among those contentions only the assertion that the arbitration award was so "imperfectly executed" that it violated the Federal Arbitration Act ("the FAA"):
"Fuller contends that the arbitration award is due to be vacated because it allegedly did not comply with the FAA, which permits the vacation of an arbitration award in the following instance:
"`(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'
"9 U.S.C. § 10(d)."
590 So.2d at 223.
After considering that contention, the Court concluded that it could not "say that the arbitrators exceeded their powers or so `imperfectly executed' them that the arbitration award in this case should be vacated." 590 So.2d at 223. (The Court did address a second contention that "the arbitrators abused their discretion" in allowing an opposing party to file its fraud claim in arbitration approximately two years after the other claims had been filed, rejecting the argument on the basis of the FAA's rule, which allowed such amendments. No specific ground or scope of review was acknowledged in that discussion. 590 So.2d at 223-24.) In short, this Court did not determine in Fuller whether the challenged award "lacked fundamental rationality" or otherwise consider a ground that the award was "irrational and arbitrary," and even less so did it take note of the ground that the award "fails to derive its essence."
The News attaches to its brief on rehearing two exhibits consisting of figures and calculations arranged in columnar form. The first, "Exhibit A," is described as representing two of the plaintiffs' hearing exhibits, detailing lost profits for James and Teresa McLendon, and Jesse Glass, respectively. The second, "Exhibit B," is described as representing calculations and a methodology for use by this Court in adjusting the awards of the McLendons, Glass, Hugh Stewart, and Kameron Hyde, "to deduct each plaintiff's post-dealership earnings from his or her award of lost future profits." The plaintiffs have moved to strike Exhibit B as an item never introduced at the arbitration hearing and not otherwise a part of the record on appeal. The News counters in its "Opposition to Motion to Strike" that "[a]ll of the information presented in Exhibit B can be, and was, ascertained from the record on appeal," citing various portions of the hearing testimony, various portions of depositions, and four hearing exhibits. Although no similar assembly of figures and computations was presented on original submission, we need not rule on the merits of the plaintiffs' motion to strike. The News offers the "spreadsheets" in question merely to demonstrate "the mathematical implications" of adjusting the awards to deduct each plaintiff's post-dealership earnings. Because we decline to grant such an adjustment, we need not rule on the motion to strike.
Having painstakingly addressed each point of law or fact the News has argued in its brief on rehearing that we overlooked or misapprehended in our original opinion and finding none of those contentions to be well taken, we deny the application for rehearing.
APPLICATION DENIED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, and STUART, JJ., concur.
WOODALL, J., recuses himself.
NOTES
[1] The text of § 6-6-15 is quoted in Part II of this opinion under the heading "The Plaintiff's Motion to Dismiss the Appeals," where it is discussed.
[2] The panel did not provide an explicit legal definition of "franchise," but its reference to cases such as Carter Equipment Co. v. John Deere Industrial Equipment Co., 681 F.2d 386 (5th Cir.1982); Ellis v. Zuck, 409 F.Supp. 1151 (N.D.Ala.1976); and Straup v. Times Herald, 283 Pa.Super. 58, 423 A.2d 713 (1980), in discussing the parties' rights under the agreements indicates that its use of the term "franchise" was intended to mean that the agreement between a dealer and the News, giving the dealer the exclusive right to distribute the News's publications for the benefit of the News, conferred a merchantable property interest on the dealer.
[3] Route allowances were means by which the News could provide a dealer with additional compensation in recognition of a difficult geographical area or some other unusual situation affecting the delivery of the newspapers.
[4] The evidence indicated that, in general, "single copy" is the delivery to, and resulting sale of, newspapers from vending machines and retail outlets, such as newsstands. "Home delivery" is exactly what the term implies.
[5] Those cases are: Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); Ex parte Celtic Life Ins. Co., 834 So.2d 766 (Ala. 2002); Ex parte Thicklin, 824 So.2d 723 (Ala. 2002); Cavalier Mfg., Inc. v. Jackson, 823 So.2d 1237 (Ala.2001), cert. denied, 535 U.S. 986, 122 S.Ct. 1536, 152 L.Ed.2d 464 (2002); and American Gen. Fin., Inc. v. Branch, 793 So.2d 738 (Ala.2000).
[6] The panel's calculation in this regard apparently considered the effect of "route allowances" associated with Hyde's branch.
[7] The Fifth Circuit itself capitulated in Williams v. Cigna Financial Advisors, Inc., 197 F.3d 752 (5th Cir.1999), recognizing manifest disregard of the law as a ground for vacatur of an arbitration award.
[8] Robbins v. Day, 954 F.2d 679, 684 (11th Cir.1992)("[f]ollowing Eleventh Circuit precedent, we decline to adopt the manifest disregard of the law standard").
[9] This, it happens, is the very formulation of this test the News advocates in its brief to this Court.
[10] The doctrine of judicial notice does not permit me to decide which method of calculating damages is superior based on my own knowledge, experience, or investigation. See Cullman Broad. Co. v. Bosley, 373 So.2d 830, 832 (Ala.1979), citing Connecticut Gen. Life Ins. Co. v. Smith, 226 Ala. 142, 145 So. 651 (1932) ("[T]his Court has held that a court may not take judicial knowledge of a fact which might be disputed by competent evidence."); Rule 201(b), Ala. R. Evid. ("A judicially noticed fact must be one not subject to reasonable dispute."). See also Gaston v. State, 63 S.W.3d 893, 900 (Tex.Ct.App.2001) ("As a general rule, appellate courts take judicial notice of facts outside the record only to determine jurisdiction over an appeal or to resolve matters ancillary to decisions that are mandated by law....").
[1] Apparently the News misnumbered the sections, because there is no section "II."